**IN THE UNITED STATES DISTRICT COURT**
**For the Southern District of California**

FILED

APR 1 4 2025

CLERK, U.S. DISTRICT COURT
SOUTHERN DISTRICT OF CALIFORNIA
BY_____DEPUTY

| | |
|---|---|
| SECURITIES AND EXCHANGE COMMISSION )<br> Plaintiff )<br> )<br>v. )<br> )<br>JAMES E. FRANKLIN )<br> Defendant ) | Case No. 02cv84 IEG (RBB) |

### DEFENDANT JAMES E. FRANKLIN'S MOTION FOR RELIEF FROM FINAL JUDGMENT PURSUANT TO FEDERAL RULE OF CIVIL PROCEDURE 60(b)

**TO THE HONORABLE COURT AND ALL PARTIES:**

1. PLEASE TAKE NOTICE that Defendant JAMES E. FRANKLIN, appearing pro se, respectfully moves this Court for an order granting relief from the Final Judgment entered against him in this matter, pursuant to Federal Rule of Civil Procedure 60(b). This motion is based on newly discovered evidence, government misconduct, and constitutional violations, including due process and First Amendment concerns, that render the judgment fundamentally unjust.

2. This motion is supported by the accompanying memorandum of points and authorities, the Declaration of James E. Franklin, and Exhibits A through I, filed concurrently herewith.

Executed on: April 5, 2025

Location: Sarasota, Florida

James E. Franklin,
Defendant, Pro Se
1212 H Street, SPC #125
Ramona, CA 92065
720-771-0140
jayvonfrank@gmail.com

**IN THE UNITED STATES DISTRICT COURT**
**For the Southern District of California**

| | |
|---|---|
| SECURITIES AND EXCHANGE COMMISSION ) | |
| Plaintiff ) | |
| ) | |
| v. ) | Case No. 02cv84 IEG (RBB) |
| ) | |
| JAMES E. FRANKLIN ) | |
| Defendant ) | |

**MEMORANDUM OF POINTS AND AUTHORITIES**

### I.  INTRODUCTION

1. This motion arises from a 2005 civil enforcement action in which the SEC alleged
   that Defendant James E. Franklin engaged in a fraudulent "pump and dump"
   scheme through the promotion of microcap stocks. Following a jury verdict, the
   Court entered a final judgment that included permanent injunctive relief and a
   penny stock bar.

2. Nearly two decades later, serious constitutional and evidentiary issues have
   emerged that warrant reconsideration of the judgment under Federal Rule of Civil
   Procedure 60(b). These include: (1) the improper admission of prejudicial summary
   evidence; (2) the sudden trial appearance of a previously unavailable co-defendant
   granted immunity; (3) the omission of critical exculpatory data; and (4) newly
   discovered evidence of prosecutorial misconduct by SEC trial counsel — all of
   which rendered the trial fundamentally unfair.

3. Relief is warranted under Rule 60(b)(6), and in part under 60(b)(2), because these
   circumstances reveal a judgment grounded in procedures and representations that
   did not meet constitutional standards of fairness.

**4. II. LEGAL STANDARD**

5. Federal Rule of Civil Procedure 60(b) permits a district court to relieve a party from a final judgment for several reasons, including:

6. (2) Newly discovered evidence that, with reasonable diligence, could not have been discovered in time to move for a new trial;

7. (6) Any other reason that justifies relief.

8. Rule 60(b)(6) is intended for "extraordinary circumstances" where justice demands reopening a judgment to prevent manifest injustice. See *Gonzalez v. Crosby*, 545 U.S. 524, 535 (2005). Courts consider the totality of circumstances, including diligence, material prejudice, and the equities of relief. See *Lal v. California*, 610 F.3d 518, 524 (9th Cir. 2010).

9. Relief under Rule 60(b)(6) may be granted even when earlier appellate review was exhausted, if subsequent developments or cumulative injustice undermine the legitimacy of the judgment.

**III. ARGUMENT**

    **A.  Improper Expert Testimony and Omissions by the SEC's Summary Witness**

10. The SEC's principal summary witness, Robert Lowry, testified under Rule 1006 but offered opinions that functioned as undisclosed expert conclusions. Lowry attributed specific profits and "matched trades" to Franklin without reviewing NSCC clearinghouse data, the only reliable source for identifying trade counterparties.

11. Critically, Lowry's Exhibit 371 omitted Franklin's substantial losses — including a $669,000 loss in Casmyn stock — which created the false impression of uninterrupted profit. Although the Casmyn omission was raised on appeal, its material effect on the jury's perception remains relevant here under Rule 60(b)(6) as

part of the cumulative prejudice caused by misleading government evidence and the Court's reliance on it.

12. Lowry's failure to disclose key methodology and the SEC's reliance on incomplete trading summaries distorted the trial record and materially contributed to the finding of fraudulent intent. These evidentiary errors, when considered with other misconduct, meet the extraordinary circumstances threshold under Rule 60(b)(6).

**B.   Surprise Immunity and Inadequate Mid-Trial Deposition of Co-Defendant Raabe**

13. Co-defendant Dieter Raabe asserted his Fifth Amendment privilege during discovery and was not expected to testify. However, during trial, the SEC suddenly disclosed that Raabe had been granted immunity and would testify.

14. The court permitted a same-day deposition on October 25, 2005, giving the SEC one hour and the defense three hours. While the defense was allowed limited questioning, this did not constitute meaningful due process under the circumstances: the defense had no opportunity to develop discovery, build impeachment material, or prepare strategy before this critical testimony.

15. Although this issue was raised on appeal, it remains relevant here because the mid-trial substitution of immunity and surprise testimony — combined with other irregularities — deprived Franklin of a fair opportunity to mount a defense. Even technically permissible rulings can result in manifest injustice when they coalesce in a fundamentally unfair process. See *Gonzalez*, 545 U.S. at 535.

**C.   Government Misconduct Documented by a Former SEC Enforcement Attorney**

16. In February 2025, Franklin spoke by phone with Stephan Jan Meyers, a former SEC Enforcement Attorney who represented him before and after trial. Meyers referenced recent Supreme Court decisions (*Loper Bright*, *Corner Post*) and

encouraged Franklin to revisit the case. He also disclosed that he had submitted

multiple formal misconduct complaints to the SEC regarding Franklin's case,

specifically urging a formal investigation. Despite his credentials and direct

knowledge of the case, those complaints were ignored, and no inquiry was ever

opened.

17. Motivated by that conversation, Franklin searched his legal storage files and, in

March 2025, located three documents authored by Meyers — including two formal

letters to the SEC dated March 11, 2004, and June 29, 2007, and a supplemental

follow-up communication dated June 29, 2007. These documents collectively detail

alleged prosecutorial misconduct by SEC trial counsel, including:

18. False statements to the Court suggesting Franklin was under criminal investigation;

19. Improper use of confidential investigative material in private litigation;

20. Unauthorized proxy depositions to elicit testimony after discovery closed;

21. Efforts to fabricate obstruction claims despite witness objections.

22. These documents were not part of the original record and, although they were found

in Franklin's stored case file, he had no reasonable awareness of their contents or

legal significance until 2025. They constitute newly discovered evidence under Rule

60(b)(2), and their contents — together with the SEC's failure to respond — support

relief under Rule 60(b)(6) as well.

Executed on: April 5, 2025

Location: Sarasota, Florida

James E. Franklin, Pro Se
1212 H Street, SPC #125
Ramona, CA 92065
720-771-0140
jayvonfrank@gmail.com

4

## IN THE UNITED STATES DISTRICT COURT
### For the Southern District of California

| | |
|---|---|
| **SECURITIES AND EXCHANGE COMMISSION** ) | |
| **Plaintiff** ) | |
| ) | |
| **v.** ) | **Case No. 02cv84 IEG (RBB)** |
| ) | |
| **JAMES E. FRANKLIN** ) | |
| **Defendant** ) | |

### DECLARATION OF JAMES E. FRANKLIN IN SUPPORT OF MOTION
### FOR RELIEF FROM FINAL JUDGMENT (Fed. R. Civ. P. 60(b)(2) and (6))

1. I, James E. Franklin, declare under penalty of perjury:

2. I am the Defendant in the above-captioned matter. I make this declaration in support of my Motion for Relief from Final Judgment under Rule 60(b) of the Federal Rules of Civil Procedure.

3. In 2002, I was named as a defendant in this civil enforcement action brought by the SEC. In 2005, judgment was entered against me following a jury trial. That judgment included a permanent injunction and a penny stock bar that have followed me ever since.

4. The SEC alleged that I had participated in a fraudulent "pump and dump" scheme through the promotion of microcap stocks, primarily via an online newsletter. At trial, the SEC introduced summary charts and testimony from Robert Lowry, which were presented as non-expert summaries under Federal Rule of Evidence 1006.

5. In reality, Lowry provided what amounted to improper expert opinions, including speculative interpretations of "matched trading" and intent. He claimed I profited consistently across the trades, while omitting material exculpatory data — such as my documented $669,000 loss in Casmyn stock — from key exhibits, including Exhibit 371.

1

6.  By omitting these losses, the SEC misled the jury into believing I engaged in exclusively profitable trades, creating a false narrative that supported a finding of fraudulent intent. These omissions were not disclosed or corrected at trial and materially affected the outcome.

7.  I have lived with the consequences of that judgment for nearly two decades. I have been unable to raise capital, seek employment, or retain investment partners due to the lasting reputational harm. The judgment appears in SEC investor alerts, databases, and online search results, discouraging any legitimate business opportunities. I have become financially indigent and unable to support my family or return to any role in public markets or finance.

8.  In late February 2025, I had a phone conversation with Stephan Jan Meyers, a former SEC Enforcement Attorney and one of my former legal counsel. During that conversation, Mr. Meyers referenced recent Supreme Court decisions including Loper Bright Enterprises v. Raimondo, which overruled Chevron U.S.A. v. NRDC, and stated that those developments might finally offer me a legal path forward.

9.  He also said that the Supreme Court cases may have an impact in turning around my case, and he encouraged me to seek legal counsel.

10. Until that conversation, I was not aware that the Supreme Court decisions could potentially affect my judgment, or that Mr. Meyers had sent such letters. His words encouraged me to search my long-stored legal records to see if I could locate the correspondence he had described.

11. In early March 2025, I found a folder in my storage that included three documents authored by Mr. Meyers: two formal letters dated March 11, 2004 and June 29, 2007, and a supplemental follow-up memo dated June 29, 2007. These letters document alleged misconduct by the SEC trial team, including improper disclosures of

confidential information, use of proxy depositions, fabrication of obstruction allegations, and false representations made to the Court that affected my ability to testify.

12. I had not reviewed or understood the contents or legal significance of these letters at the time they were written. For nearly two decades, I had been overwhelmed by the burden of the judgment and had effectively given up hope of revisiting my case. It was only after Mr. Meyers' call that I became motivated to reexamine my legal history and to take steps toward seeking post-judgment relief.

13. Tragically, I learned shortly afterward that Mr. Meyers passed away on March 9, 2025 — just weeks after our final conversation. His last words to me about this case gave me the emotional and legal strength to take action.

14. I respectfully submit that the evidentiary omissions at trial and the letters from Mr. Meyers — combined with the procedural misconduct now documented in the record — constitute newly discovered evidence under Rule 60(b)(2), or, in the alternative, extraordinary circumstances under Rule 60(b)(6). I had no reasonable access to or awareness of the full implications of this information at the time of trial, post-trial proceedings, or appeal.

15. I declare under penalty of perjury under the laws of the United States that the foregoing is true and correct.

Executed on: April 5, 2025
Location: Sarasota, Florida

James E. Franklin, Pro Se
1212 H Street, SPC #125
Ramona, CA 92065
720-771-0140
jayvonfrank@gmail.com

**IN THE UNITED STATES DISTRICT COURT**
**For the Southern District of California**

SECURITIES AND EXCHANGE COMMISSION )
  Plaintiff )
                              )
v.                          )   **Case No. 02cv84 IEG (RBB)**
                              )
JAMES E. FRANKLIN )
  Defendant )

**CERTIFICATE OF SERVICE**

I, James E. Franklin, hereby certify that on April 5th, 2025, I served a true and correct copy of the following documents:

- Motion for Relief from Final Judgment Pursuant to Rule 60(b)

- Declaration of James E. Franklin

- Exhibits A through I by placing a copy in a sealed envelope, with proper postage prepaid, and depositing it in the United States mail, addressed to:

Securities and Exchange Commission
Los Angeles Regional Office
444 South Flower Street, Suite 900
Los Angeles, CA 90071

U.S. Department of Justice – Civil Division
950 Pennsylvania Avenue NW
Washington, DC 20530-0001

I declare under penalty of perjury under the laws of the United States that the foregoing is true and correct.

Executed on: April 5, 2025
Location: Sarasota, Florida

James E. Franklin, Pro Se
1212 H Street, SPC #125
Ramona, CA 92065
720-771-0140
jayvonfrank@gmail.com

<div align="center">

**IN THE UNITED STATES DISTRICT COURT**
**For the Southern District of California**

</div>

| | |
|---|---|
| **SECURITIES & EXCHANGE COMMISSION** | ) |
|   **Plaintiff** | ) |
| | ) |
| **v.** | )   **Case No. 02cv84 IEG (RBB)** |
| | ) |
| **JAMES E FRANKLIN** | ) |
|   **Defendant** | ) |

<div align="center">

**EXHIBITS TO ACCOMPANY MOTION FOR RELIEF FROM FINAL JUDGMENT**

</div>

| | Exhibit Description |
|---|---|
| A | Exhibit 371 – Summary Chart used by SEC summary witness (Robert Lowry) |
| B | Exhibit 89 – Bloomberg trading volume data showing market conditions |
| C | Raabe Immunity Order – Government's mid-trial grant of immunity to co-defendant |
| D | Excerpt from Appellant's Brief – Ninth Circuit Case No. 06-55357 (Pages i–ii, 1–7, 17–21, 29, 34–36, 38–39, 44) |
| E | Declaration of James E. Franklin (attached) |
| F | March 11, 2004 letter from Stephan Jan Meyers to SEC Director of Enforcement |
| G | June 29, 2007 follow-up letter and supplemental memo from Meyers to SEC Commissioners |
| H | April 28, 2004 "Un-Fairy Tale" investor letter by Meyers detailing misconduct |
| I | Google search results & Declaration of Harm related to ongoing reputational damage |

Name: James E. Franklin

Address: 1212 H St., Ste 125
Ramona, CA 92065

Phone Number: 720-771-0140

Email Address: jayvonfrank@gmail.com

*Pro Se*

# UNITED STATES DISTRICT COURT

## SOUTHERN DISTRICT OF CALIFORNIA

| James E. Franklin | CASE NUMBER |
|---|---|
| PLAINTIFF(S) | 02-cv84 IEG (RBB) |
| v. | |
| Securities & Exchange Commission | MOTION FOR LEAVE TO ELECTRONICALLY FILE DOCUMENTS |
| DEFENDANT(S) | |

As the ☒ Plaintiff ☐ Defendant proceeding pro se in the above-captioned matter, I respectfully ask the Court for permission to participate in electronic filing ("e-filing") in this case. I hereby affirm:

1. I have reviewed and agree to follow all rules and policies included in the Court's Electronic Case Filing Administrative Policies and Procedures Manual available at https://www.casd.uscourts.gov/attorney/filing-procedures.aspx.

2. I understand that once I register for e-filing, I will receive notices and documents in Southern District cases only by e-mail and not by U.S. mail.

3. I understand that if my use of the Court's e-filing system is unsatisfactory, my e-filing privileges for this case may be revoked and I will be required to file documents in paper with the Clerk's Office.

4. I understand that I may not e-file on behalf of any other person in this or any other case.

5. I have regular access to the technical requirements necessary to e-file successfully, such as (*check all that apply*):

   ☒ A computer running on Windows 7 or higher, MacOS X or higher, or Linux;

   ☒ Software to convert documents from a word processor format to PDF, such as Adobe Acrobat;

   ☒ Document scanner to convert paper documents to PDF files;

   ☒ Internet access capable of downloading and uploading file sizes up to 35 MB;

   ☒ A compatible browser, such as Firefox 15 or higher, Microsoft Edge, or Safari 5.1 or higher; and

   ☒ An email account to receive notifications from the Court.

6. I understand that, if granted leave to electronically file, I must register as a user with the Clerk's Office and as a subscriber to PACER within <u>five (5) days</u>. To establish a PACER account, click "Register for an Account" at http://pacer.uscourts.gov.

Date: 04/02/2025                    Signature: *James Franklin*

# EXHIBIT A

Exhibit 371 – Summary Chart used by SEC summary witness (Robert Lowry)

371

## SUMMARY EXHIBIT 371

### IPO, AVALON TRUST, AND VECTOR KEEL'S PROFITS ON SALES OF AXPL

### JANUARY 20, 1997 THROUGH MAY 30, 1997

| Account | Broker Dealer | Exhibit Page | Number of Shares Sold | Realized Profits (Loss) |
|---|---|---|---|---|
| IPO | J ALEXANDER SECS | 2 | 15,270 | 96,850 |
| IPO | EQUITRADE SECURITIES | 3 | 8,000 | 40,029 |
| IPO | COWENS/SFI INVESTMENTS | 4-5 | 98,000 | 883,625 |
| AVALON TRUST | UNION SECURITIES | 6 | 17,600 | 219,496 |
| **TOTALS IPO & AVALON TRUST** | | | **138,870** | **1,240,000** |
| VECTOR KEEL | UNION SECURITIES | 7 | 100,000 | 1,241,539 |
| MATCHED IPO BUYS (SEE EXHIBIT 373) | | | -47,500 | -595,609 |
| **ADJUSTED VECTOR KEEL SALES TOTALS** | | | **52,500** | **645,930** |
| **TOTALS IPO, AVALON TRUST & VECTOR KEEL** | | | **191,370** | **1,885,930** |

Page 1 of 7

Exhibit 371

IPO CONSULTANTS
BROKERAGE ACCOUNT

J. ALEXANDER SECURITIES
LOS ANGELES, CA
ACCOUNT # 667-51358

ACQUISITIONS AND SALES OF AMALGAMATED EXPLORATIONS ("AXPL")
JANUARY 21, 1997 THROUGH FEBRUARY 25, 1997

| TRADE DATE | SETTLE DATE | BOUGHT/ RECEIVED | SOLD/ DELIVERED | PRICE | AMOUNT PAID | AMOUNT RECEIVED | CITATIONS TO EXHIBITS | NOTES |
|---|---|---|---|---|---|---|---|---|
| 1/21/1997 | 1/24/1997 | | 2,000 | 9.1250 | | $18,246 | Ex.569, BDJA 0552 | |
| 1/22/1997 | 1/27/1997 | | 3,000 | 9.5000 | | $28,496 | Ex.569, BDJA 0553 | |
| 1/27/1997 | 1/27/1997 | 5,000 | | Receive | $0 | | Ex.569, BDJA 0554 | |
| 1/23/1997 | 1/28/1997 | | 1,000 | 12.5000 | | $12,500 | Ex.569, BDJA 0553 | |
| 1/23/1997 | 1/28/1997 | | 1,000 | 11.2500 | | $11,246 | Ex.569, BDJA 0553 | |
| 1/24/1997 | 1/29/1997 | | 1,000 | 12.7500 | | $12,746 | Ex.569, BDJA 0553 | |
| 1/29/1997 | 1/29/1997 | 10,000 | | Receive | $0 | | Ex.569, BDJA 0553 | |
| 1/31/1997 | 1/31/1997 | | 5,000 | Deliver | | $0 | Ex.569, BDJA 0554 | |
| 1/29/1997 | 2/3/1997 | | 1,000 | 11.5000 | | $11,496 | Ex.569, BDJA 0554 | |
| 1/29/1997 | 2/3/1997 | | 1,000 | 12.2500 | | $12,250 | Ex.569, BDJA 0554 | |
| 2/13/1997 | 2/19/1997 | 1,000 | | 10.0000 | $10,129 | | Ex.569, BDJA 0556 | |
| 2/25/1997 | 2/25/1997 | | 270 | Deliver | | $0 | Ex.569, BDJA 0557 | |
| TOTALS | | 16,000 | 15,270 | | $10,129 | $106,979 | | |

Matched Transactions (See Exhibit 373)

| TRADE DATE | SETTLE DATE | BOUGHT/ RECEIVED | SOLD/ DELIVERED | PRICE | AMOUNT PAID | AMOUNT RECEIVED | CITATIONS TO EXHIBITS | NOTES |
|---|---|---|---|---|---|---|---|---|
| 2/5/1997 | 2/10/1997 | 5,000 | | 12.8125 | $64,291 | | Ex.569, BDJA 0556 | Vector Keel Sale |
| 2/6/1997 | 2/11/1997 | 2,500 | | 12.8125 | $32,225 | | Ex.569, BDJA 0556 | Vector Keel Sale |
| MATCHED TRADES | | 7,500 | | | 96,516 | | | |

Realized Profit (Loss) Amalgamated Explorations as of February 3, 1997    $96,850

Exhibit 371

IPO CONSULTANTS
BROKERAGE ACCOUNT

EQUITRADE SECURITIES CORP.
LAKE FOREST, CA.
ACCOUNT #44293002 CHANGED TO #44176003

ACQUISITIONS AND SALES OF AMALGAMATED EXPLORATIONS ("AXPL")
OCTOBER 25, 1996 THROUGH MAY 16, 1997

| TRADE DATE | SETTLE DATE | BOUGHT/ RECEIVED | SOLD/ DELIVERED | PRICE | AMOUNT PAID | AMOUNT RECEIVED | CITATIONS TO EXHIBITS | NOTES |
|---|---|---|---|---|---|---|---|---|
| 10/25/1996 | 10/25/1996 | 1,811 | | Open Pos | $0 | | | No Oct Statement |
| 10/25/1996 | 10/30/1996 | | 100 | 5.37500 | | $461 | Ex. 603.BDPB 0004 | |
| 10/31/1996 | 10/31/1996 | 5,000 | | Receive | $0 | | Ex. 603.BDPB 0004 | |
| 10/30/1996 | 11/4/1996 | 100 | | 5.50000 | $627 | | Ex. 603.BDPB 0004 | |
| 10/31/1996 | 11/5/1996 | | 2,000 | 5.37500 | | $10,480 | Ex. 603.BDPB 0004 | |
| 11/22/1996 | 11/27/1996 | 315 | | 5.25000 | $1,730 | | Ex. 603.BDPB 0004 | |
| 12/9/1996 | 12/12/1996 | | 500 | 5.37500 | | $2,611 | Ex. 603.BDPB 0006 | |
| 12/12/1996 | 12/17/1996 | | 1,000 | 5.50000 | | $5,361 | Ex. 603.BDPB 0006 | |
| 12/18/1996 | 12/23/1996 | 65 | | 5.12500 | $410 | | Ex. 603.BDPB 0006 | |
| 1/13/1997 | 1/16/1997 | | 1,000 | 6.00000 | | $5,848 | Ex. 603.BDPB 0008 | |
| 1/20/1997 | 1/23/1997 | | 1,000 | 6.50000 | | $6,336 | Ex. 603.BDPB 0008 | |
| 1/20/1997 | 1/23/1997 | | 500 | 6.00000 | | $2,925 | Ex. 603.BDPB 0008 | |
| 1/20/1997 | 1/23/1997 | | 1,500 | 6.00000 | | $8,773 | Ex. 603.BDPB 0008 | |
| 1/24/1997 | 1/24/1997 | 400 | | Receive | $0 | | Ex. 603.BDPB 0008 | |
| 1/27/1997 | 1/27/1997 | 500 | | Receive | $0 | | Ex. 603.BDPB 0008 | |
| 5/16/1997 | 5/16/1997 | | 400 | Deliver | | $0 | Ex. 603.BDPB 0014 | |
| TOTALS | | 8,191 | 8,000 | | $2,766 | $42,795 | | |

Realized Profit (Loss) Amalgamated Explorations ("AXPL")       $40,029

## IPO CONSULTANTS
## BROKERAGE ACCOUNT

### COWEN/SFI INVESTMENTS
### ACCOUNT #4D-60389

## ACQUISITIONS AND SALES OF AMALGAMATED EXPLORATIONS ("AXPL")
## SEPTEMBER 27, 1996 THRU FEBRUARY 6, 1997

| TRADE DATE | SETTLE DATE | BOUGHT/ RECEIVED | SOLD/ DELIVERED | PRICE | AMOUNT PAID | AMOUNT RECEIVED | CITATIONS TO EXHIBITS | NOTES |
|---|---|---|---|---|---|---|---|---|
| 9/27/1996 | 9/27/1996 | 30,000 | | Receive | $0 | | Ex.562.BDCW 0030 | |
| 10/31/1996 | 10/31/1996 | | 5,000 | Deliver | | | Ex.562.BDCW 0034 | |
| 1/22/1997 | 1/22/1997 | 80,000 | 0 | Receive | $0 | | Ex.562.BDCW 0034 | |
| 1/20/1997 | 1/23/1997 | | 5,000 | 5.9700 | | $29,847 | Ex.562.BDCW 0034 | |
| 1/20/1997 | 1/23/1997 | | 1,000 | 5.9600 | | $5,958 | Ex.562.BDCW 0034 | |
| 1/20/1997 | 1/23/1997 | | 4,000 | 13.5000 | | $53,996 | Ex.562.BDCW 0034 | |
| 1/20/1997 | 1/23/1997 | | 10,000 | 12.1250 | | $121,244 | Ex.562.BDCW 0034 | |
| 1/20/1997 | 1/23/1997 | | 5,000 | 8.1250 | | $40,622 | Ex.562.BDCW 0034 | |
| 1/20/1997 | 1/23/1997 | | 1,000 | 12.2500 | | $12,248 | Ex.562.BDCW 0034 | |
| 1/20/1997 | 1/23/1997 | | 1,000 | 10.0000 | | $9,998 | Ex.562.BDCW 0034 | |
| 1/20/1997 | 1/23/1997 | | 13,000 | 9.0000 | | $116,994 | Ex.562.BDCW 0034 | |
| 1/20/1997 | 1/23/1997 | | 5,000 | 8.7500 | | $43,747 | Ex.562.BDCW 0034 | |
| 1/20/1997 | 1/23/1997 | | 5,000 | 9.2500 | | $46,246 | Ex.562.BDCW 0034 | |
| 1/20/1997 | 1/23/1997 | | 6,000 | 8.5000 | | $50,996 | Ex.562.BDCW 0034 | |
| 1/20/1997 | 1/23/1997 | | 26,000 | 8.2500 | | $214,491 | Ex.562.BDCW 0304 | |
| 1/21/1997 | 1/24/1997 | | 5,000 | 8.2500 | | $41,247 | Ex.562.BDCW 0034 | |
| 1/21/1997 | 1/24/1997 | | 1,000 | 8.5000 | | $8,498 | Ex.562.BDCW 0034 | |
| 1/21/1997 | 1/24/1997 | | 10,000 | 8.7500 | | $87,495 | Ex.562.BDCW 0034 | |
| 1/27/1997 | 1/27/1997 | | 5,000 | Deliver | | $0 | Ex.562.BDCW 0034 | |
| 1/27/1997 | 1/27/1997 | | 500 | Deliver | | $0 | Ex.562.BDCW 0034 | |
| TOTALS | | 110,000 | 108,500 | | $0 | $883,625 | | |
| SHARES SOLD | | | 98,000 | | | $883,625 | | |
| DELIVERED | | | 5,500 | | | $0 | | |

IPO CONSULTANTS
BROKERAGE ACCOUNT

COWEN/SFI INVESTMENTS
ACCOUNT #4D-60389

ACQUISITIONS AND SALES OF AMALGAMATED EXPLORATIONS ("AXPL")
SEPTEMBER 27, 1996 THRU FEBRUARY 6, 1997

Matched Transactions (See Exhibit 373)

| TRADE DATE | SETTLE DATE | BOUGHT/ RECEIVED | SOLD/ DELIVERED | PRICE | AMOUNT PAID | AMOUNT RECEIVED | CITATIONS TO EXHIBITS | NOTES |
|---|---|---|---|---|---|---|---|---|
| 2/3/1997 | 2/6/1997 | 10,000 | | 14.3950 | $143,952 | | Ex.562.BDCW 0036 | Vector Keel Sale |
| 2/4/1997 | 2/7/1997 | 10,000 | 0 | 13.3000 | $133,002 | $0 | Ex.562.BDCW 0036 | Vector Keel Sale |
| 2/4/1997 | 2/7/1997 | 5,000 | 0 | 13.3000 | $66,502 | $0 | Ex.562.BDCW 0036 | Vector Keel Sale |
| 2/4/1997 | 2/7/1997 | 5,000 | 0 | 13.3000 | $66,502 | $0 | Ex.562.BDCW 0036 | Vector Keel Sale |
| 2/6/1997 | 2/11/1997 | 10,000 | 0 | 12.3500 | $123,502 | $0 | Ex.562.BDCW 0036 | Vector Keel Sale |
| MATCHED TOTALS | | 40,000 | 0 | | $533,460 | $0 | | |

Realized Profit (Loss) Amalgamated Explorations (as of January 27, 1997)        $883,625

Exhibit 371

THE AVALON TRUST
BROKERAGE ACCOUNT

UNION SECURITIES, LTD.
VANCOUVER, B.C., CANADA
ACCOUNT # 013-850U-6

ACQUISITIONS AND SALES OF AMALGAMATED EXPLORATIONS ("AXPL")
JANUARY 21 THRU MAY 20, 1997

| TRADE DATE | SETTLE DATE | BOUGHT/ RECEIVED | SOLD/ DELIVERED | PRICE | AMOUNT PAID | AMOUNT RECEIVED | CITATIONS TO EXHIBITS | NOTES |
|---|---|---|---|---|---|---|---|---|
| 1/21/1997 | 1/21/1997 | 29,500 | | | $0.00 | | Ex. 572, BCSC 0378 | |
| 1/23/1997 | 1/28/1997 | | 200 | 12.2500 | | $2,375.00 | Ex. 572, BCSC 0378 | |
| 1/23/1997 | 1/28/1997 | | 1,300 | 12.5000 | | $15,768.75 | Ex. 572, BCSC 0378 | |
| 1/23/1997 | 1/28/1997 | | 500 | 12.7500 | | $6,215.62 | Ex. 572, BCSC 0378 | |
| 1/24/1997 | 1/29/1997 | | 1,500 | 13.7500 | | $20,029.37 | Ex. 572, BCSC 0378 | |
| 1/24/1997 | 1/29/1997 | | 500 | 14.0000 | | $6,825.00 | Ex. 572, BCSC 0378 | |
| 1/24/1997 | 1/29/1997 | | 2,000 | 14.4375 | | $28,138.12 | Ex. 572, BCSC 0378 | |
| 1/24/1997 | 1/29/1997 | | 5,500 | 14.8125 | | $79,432.00 | Ex. 572, BCSC 0378 | |
| 1/30/1997 | 2/4/1997 | | 2,000 | 13.7500 | | $26,950.00 | Ex. 572, BCSC 0379 | |
| 2/5/1997 | 2/10/1997 | 500 | | 13.0000 | $6,630.00 | | Ex. 572, BCSC 0379 | |
| 4/30/1997 | 5/5/1997 | | 950 | 11.1875 | | $10,415.13 | Ex. 572, BCSC 0382 | |
| 5/13/1997 | 5/16/1997 | | 1,000 | 10.7500 | | $10,535.00 | Ex. 572, BCSC 0382 | |
| 5/20/1997 | 5/23/1997 | | 150 | 9.2500 | | $1,312.50 | Ex. 572, BCSC 0382 | |
| 5/20/1997 | 5/23/1997 | | 2,000 | 9.2500 | | $18,130.00 | Ex. 572, BCSC 0382 | |
| **TOTALS** | | 30,000 | 17,600 | | $6,630.00 | $226,126.49 | | |

Realized Profit (Loss) Amalgamated Explorations ("AXPL")          $219,496.49

Exhibit 371

VECTOR KEEL, LTD.
BROKERAGE ACCOUNT

UNION SECURITIES, LTD
VANCOUVER, B.C., CANADA
ACCOUNT # 028-525U-9

ACQUISITIONS AND SALES OF AMALGAMATED EXPLORATIONS ("AXPL")
JANUARY 27, 1997 THRU April 30, 1997

| TRADE DATE | RECEIVED/ BOUGHT | SOLD/ DELIVERED | PRICE | AMOUNT PAID | AMOUNT RECEIVED | CITATIONS TO EXHIBITS | NOTES |
|---|---|---|---|---|---|---|---|
| 1/27/1997 | 100,000 | | Receive | $0 | | | |
| 2/3/1997 | | 10,000 | 13.0000 | | $127,400 | Ex.572, BCSC 0137 | IPO Purchase |
| 2/3/1997 | | 12,500 | 13.9688 | | $171,117 | Ex.572, BCSC 0136 | |
| 2/3/1997 | | 8,500 | 14.3438 | | $119,483 | Ex.572, BCSC 0137 | |
| 2/4/1997 | | 7,500 | 12.8750 | | $94,631 | Ex.572, BCSC 0137 | IPO Purchase |
| 2/4/1997 | | 2,500 | 13.0000 | | $31,350 | Ex.572, BCSC 0137 | IPO Purchase |
| 2/4/1997 | | 5,000 | 13.0000 | | $64,313 | Ex.572, BCSC 0137 | IPO Purchase |
| 2/4/1997 | | 2,500 | 13.0000 | | $32,500 | Ex.572, BCSC 0137 | |
| 2/4/1997 | | 5,000 | 13.1250 | | $63,700 | Ex.572, BCSC 0137 | IPO Purchase |
| 2/5/1997 | | 5,000 | 12.8125 | | $62,774 | Ex.572, BCSC 0137 | IPO Purchase |
| 2/5/1997 | | 5,000 | 13.0000 | | $63,700 | Ex.572, BCSC 0137 | |
| 2/6/1997 | | 10,000 | 12.2500 | | $120,050 | Ex.572, BCSC 0137 | IPO Purchase |
| 2/6/1997 | | 2,000 | 12.7500 | | $24,990 | Ex.572, BCSC 0137 | |
| 2/6/1997 | | 2,500 | 12.8125 | | $31,391 | Ex.572, BCSC 0137 | IPO Purchase |
| 2/21/1997 | | 5,000 | 10.2500 | | $50,225 | Ex.572, BCSC 0137 | |
| 2/25/1997 | | 5,000 | 11.0000 | | $53,900 | Ex.572, BCSC 0138 | |
| 2/27/1997 | | 5,000 | 11.2500 | | $55,125 | Ex.572, BCSC 0139-40 | |
| 2/28/1997 | | 3,000 | 11.0000 | | $32,340 | Ex.572, BCSC 0139-40 | |
| 3/24/1997 | | 750 | 11.1875 | | $8,223 | Ex.572, BCSC 0141 | |
| 4/1/1997 | | 3,000 | 10.7500 | | $31,605 | Ex.572, BCSC 0143 | |
| 4/30/1997 | | 250 | 11.1875 | | $2,722 | Ex.572, BCSC 0144 | |
| | | | | | | | |
| **TOTALS** | **100,000** | **100,000** | | **$0** | **$1,241,539** | | |

Realized Profit (Loss) Amalgamated Explorations ("AXPL")       $1,241,539

Page 7 of 7

# EXHIBIT  B

Exhibit 89 – Bloomberg trading volume data showing market conditions



**EXCERPT ONLY**
Entire Exhibit
Available on the
Attached CD e



Exhibit 89                    BLBG 0011

# EXHIBIT  C

Raabe Immunity Order – Government's mid-trial grant of immunity to co-defendant

USDC SCAN INDEX SHEET

















CAG    10/26/05    13:32

3:02-CV-00084    SEC V. FRANKLIN

*405*

*M.*



1 | CAROL C. LAM
United States Attorney
2 | STEVEN E. STONE
Assistant U.S. Attorney
3 | California State Bar No. 186533
Federal Office Building
4 | 880 Front Street, Room 6293
San Diego, California 92101-8893
5 | Telephone: (619) 557-7039

6 | Attorneys for Plaintiff
United States of America

7

8

9           UNITED STATES DISTRICT COURT

10        SOUTHERN DISTRICT OF CALIFORNIA

11 | U.S. SECURITIES AND EXCHANGE    )   Civil No. 3:02cv84-DMS (RBB)
COMMISSION,              )
12                      )
13         Plaintiff,      )
                     )
14      v.             )   MOTION FOR ORDER
                     )   COMPELLING TESTIMONY
15 | JAMES E. FRANKLIN, et al.,      )
                     )
16         Defendants.    )

17      The United States Attorney for the Southern District of California hereby moves this Court to

18 | issue an order pursuant to the provisions of 18 U.S.C. § 6001, et seq., compelling **Dieter Raabe** to give

19 | testimony or provide other information which this witness is likely to refuse to give or provide on the

20 | basis of this witness' privilege against self-incrimination, as to all matters about which this witness may

21 | be interrogated in the trial U.S. Securities and Exchange Commission v. James E. Franklin, et al., Civil

22 | No. 3:02cv84 DMS (RBB), and respectfully alleges as follows:

23      1.    That said witness has been called to testify or provide other information before said trial;

24      2.    In the judgment of the undersigned, the testimony or other information from said witness

25 | may be necessary to the public interest;

26      3.    In the judgment of the undersigned, said witness is likely to refuse to testify or provide

27 | other information on the basis of this witness' privilege against self-incrimination; and

28 | ///

405

1   4.  This application is made with the approval of **Mary Lee Warren**, Deputy Assistant

2 Attorney General of the Criminal Division of the Department of Justice, pursuant to the authority vested

3 in such person by 18 U.S.C. § 6003 and 28 C.F.R. § 0.175.

4   A copy of the letter expressing such approval is attached hereto.

5   DATED:  October _19_, 2005.

6

7

8             CAROL C. LAM
              United States Attorney

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

2



**U.S. Department of Justice**

Criminal Division

_Office of the Assistant Attorney General_                    _Washington, DC 10530-0001_

OCT 1 1 2005

The Honorable Carol C. Lam
United States Attorney
Southern District of California
San Diego, California 92101

Attention.    Kenneth Guido
              Assistant Chief Litigation Counsel
              Securities and Exchange Commission

      Re.    SEC v. Franklin, et al., Case No. 02-CV-84 DMS (KRB)(S.D.C.A.)

Dear Ms. Lam:

      Pursuant to the authority vested in me by 18 U.S.C. 6003(b) and 28 C.F.R. 0.175(a), I
hereby approve your request for authority to apply to the United States District Court for the
Southern District of California for an order pursuant to 18 U.S.C. 6002-6003 requiring
Dieter Raabe to give testimony or provide other information in the above matter and in any
further proceedings resulting therefrom or ancillary thereto.

                                        Sincerely,

                                        Alice S. Fisher
                                        Assistant Attorney General

                                        Mary Lee Warren
                                        Deputy Assistant Attorney General
                                        Criminal Division

# EXHIBIT D

Excerpt from Ninth Circuit appeal brief (CV00847)

# 06-55357

## IN THE UNITED STATES COURT OF APPEALS
## FOR THE NINTH DISTRICT CIRCUIT

---

### SECURITIES AND EXCHANGE COMMISSION,

#### Plaintiff

#### v.

### JAMES E. FRANKLIN, individually and as trustee of Avalon Trust, DIETER RAABE, SAMIEL WOLANYK, VECTOR KEEL LTD., a Turks & Caicos registered company, INITIAL PUBLIC OFFERING CONSULTANS, INC., a Nevada Corporation, NET INCOME, a Nevada Corporation, And Avalon Trust.

#### Defendants

---

**On appeal from the United States District Court for the Southern District of California**

---

**BRIEF OF THE DEFENDANT JAMES E. FRANKLIN**

---

**JAMES E. FRANKLIN
IN PRO PER
3525A DEL MAR HEIGHTS RD.
SUITE 163
SAN DIEGO, CA  92130**

STATEMENT OF THE ISSUES ..................................................................................... 1

STATEMENT OF THE CASE ...................................................................................... 2

STATEMENT OF THE FACTS ................................................................................... 8

   1.    THE MERGER OF SUE WONG AND AMALGAMATED ............................ 8

   2.    CORPORATIONS CONTOLLED BY DIETER RAABE . ........................... 11

   3.    THE VECTOR KEEL ACCOUNT .............................................................. 11

   4.    DIETER RAABE'S BROKERAGE ACCOUNTS .......................................... 12

   5.    FRANKLINS BROKERAGE ACCOUNTS .................................................. 12

   6.    WOLANYK AND RED HOT STOCKS ....................................................... 12

   7.    NET INCOME CORPORATION ................................................................. 14

   8.    IPO  AND FRANKLINS RELATIONSHIP WITH WOLANYK AND RED HOT STOCKS ............................................................................................. 15

   9.    ADVERTISEMENT PAYMENTS TO NET INCOME FROM INVESTORS RESEARCH ................................................................................................. 15

  10.   THE BENIFICIAL  RESULTS TO COMPANIES PROFILED ON  RED HOT STOCKS . ............................................................................................. 15

STANDARD OF REVIEW ......................................................................................... 16

ARGUMENT ............................................................................................................... 17

I.     THE COMMISSION UNDER 1006 OF THE FEDERAL RULES OF EVIDENCE INTRODUCED AS ITS DESIGNATED SUMMARY WITNESS A MR. ROBERT LOWRY WHO IN REALITY TESTIFIED AS AN EXPERT WITNESS EXPRESSING INADMISSIBLE OPINIONS EXPERT CONCLUSIONS WITHOUT FOUNDATION, MAKING MATERIAL OMISSIONS AND FACTUAL DISTORTIONS AS TO MATTERS CRITICAL TO FRANKLIN ALL OF WHICH RESULTED IN FRANKLINS' CASE BEING SEVERELY AND IRREPARABLY PREJUDICED. ........................ 17

II.    TWO MONTHS BEFORE THE TRIAL AND AFTER THE DISOVERY CUT OFF DATE THE COURT ALLOWED THE COMISSION TO PLACE INTO EVIDENCE AND PUT IN EXHIBITS AS TO NINE MORE PROFILED COMPANIES MORE THAN DOUBLING FRANKLINS TRIAL PREPARATION BURDEN AND LEAVING HIM WITH THE TASK OF PREPARING FOR A SUBSTANTIALLY ENLARGED CASE WITHOUT THE BENEFIT OF DISCOVERY. ............................................... 29

TOC

III.    IN COMPLETE VIOLATION OF THE FEDERAL RULES OF
        CIVIL PROCEDURE 26(a)(3)(A) THE SEC PURPOSELY ADOPTED
        A STRATAGEM OF DELAYING THE PROCESS OF SEEKING AN
        ORDER GRANTING IMMUNITY FOR DEFENDANT AND PARTY
        DIETER RAABE AT THE LAST MINUTE THE DAY BEFORE THE
        GOVERNMENT WAS TO HAVE RESTED ITS CASE THUS
        DENYING TO FRANKLIN THE MAKING OF A MOTION TO
        CONTINUE BEFORE THE TRIAL STARTED.  THIS TACTIC
        FURTHER DENIED TO FRANKLIN THE OPPORTUNITY TO
        TAKE A TIMELY PRETRIAL DEPOSITION OF RAABE AND
        ENGAGE IN FURTHER DISCOVERY TO COUNTER RAABES
        TESTIMONY CREATING INCURABLE PREJUDICE TO
        FRANKLIN. THIS WAS DONE IN A CONTEXT IN WHICH VITAL
        EXCULPATORY EVIDENCE WAS GIVEN TO THE DEFENSE
        AGAIN AT THE LAST POSSIBLE MOMENT IN ORDER TO
        PREVENT ITS BEING BROUGHT TO THE ATTENTION OF THE
        JURY. .................................................................................... 34

        AN ANALYSIS OF RAABE'S TESTIMONY .......................................... 44

IV.     THE DISTRICT COURT ERRORED IN ALLOWING THE JURY
        TO DECIDE WHETHER OR NOT APPROVAL BY THE STATE
        OF NEW YORK TO AXPL'S M-11 APPLICATION CONSTITUTES
        AN EXEMPTIN TO THE 1933 ACT REGISTRATION
        REQUIREMENTS IS A QUESTION OF LAW NOT FACT AND
        MUST BE DECIDED BY THE COURT. ........................................... 48

V.      FRANKLIN IS NOT LIABLE UNDER SECTION 17A OF THE
        SECURITIES ACT AND OR 10B(5) OF THE EXCHANGE ACT
        AND RULE 10B-5 THEREUNDER SINCE RED HOT STOCKS WAS
        A BONA FIDE PUBLICATION WITH A GENERAL AND
        REGULAR CIRCULATION. .......................................................... 50

CONCLUSION ............................................................................ 54

TOC

abuse of discretion standard and beyond the courts jurisdiction.  FRCP 50(a)
and U.S.C. 2642.  The order ruling that RHS is not an exempt publication is
error under  SEC v. Wall Street Publishing Institute, Inc., 664 F. Supp. 554
(D.C. 1986) and The First Amendment to the United States Constitution,
December 15, 1791.

## ARGUMENT

**I.   THE COMMISSION UNDER 1006 OF THE FEDERAL RULES
OF EVIDENCE INTRODUCED AS ITS DESIGNATED
SUMMARY WITNESS A MR. ROBERT LOWRY WHO IN
REALITY TESTIFIED AS AN EXPERT WITNESS
EXPRESSING INADMISSIBLE OPINIONS EXPERT
CONCLUSIONS WITHOUT FOUNDATION, MAKING
MATERIAL OMISSIONS AND FACTUAL DISTORTIONS AS
TO MATTERS CRITICAL TO FRANKLIN ALL OF WHICH
RESULTED IN FRANKLINS' CASE BEING SEVERELY AND
IRREPARABLY PREJUDICED.**

Neither side designated any experts in their pre trial orders *See
plaintiffs and Franklins Pre-trial orders* D-316.

Mr. Lowry testified that he had been hired by the SEC to primarily
make a summary of the brokerage accounts. He was not hired as an expert to
provide expert opinion. *See* T.I, p. 436, 1-10.

The plaintiff put in evidence 14 summary sheets prepared by Lowry
*Exhibits* 371 – 385.   Summarizing charts *Exhibits* 371, 372, 373 and 378,
are reproduced herein in their entirety in the appendix to this brief

These sheets were based on an examination of the Vector Keel, Ltd IPO consultants, Inc., Avalon Trust, Net Services Marketing brokerage accounts and the trading and transfer records of AXPL and NTSA two of the 17 companies profiled by the Red Hot Stocks reports and; the transfer of funds between each of the defendants.

A summary of titles, release and posting dates for Red Hot Stocks email and web site profiles and updates were presented as Exhibit 385.

Exhibit 371 is a seven page document which purportedly summarizes the trades in AXPL from January 20th to May 30th 1997 in the Vector Keel account and Franklins IPO, Avalon trust, J Alexander, S.W. Cowan and Equitrade brokerage accounts. *See Exhibit(s)* 569, 603, 562 and 572 respectively.

Page 1 is a summary page which summarizes the total of the account activities as shown in pages 2 though 7 of the alleged matched trades as shown by 371.

Page 2 summarizes Franklin's trades in AXPL from February 3rd to the sixth in the J. Alexander account.  During that time Franklin bought a total of 7,500 shares of AXPL stock for a total cost of $95,516.00.

Page 5 summarizes trades in AXPL in the S.W Cowan account.  It shows Franklin bought a total of 40,000 shares $595,609.

18

22

These purchases fly in the face of the Commissions theory of Franklin being involved in a pump and dump theory.  In these accounts he is not dumping he is buying.

What was in reality expert opinion testimony by Lowry as illustrated by #371 was intended to establish three things:

1.　　　Franklin and Raabe acted in collusion in the trading of AXPL:  Raabe matching sales of the stock from Vector to IPO's buys in the J. Alexander and S.W. Cowan accounts.

2.　　　Diminish by $595,000 the profits of Vector Keel by eliminating from its account money realized from its sale of AXPL stock in the amount of $595,930 on 2/3/97, 2/4/97, 2/5/97 and 2/6/97.

3.　　　To support the SEC theory of a pump and dump scheme by shifting the same $595,000 to Franklin by not deducting from his J. Alexander account money used to buy AXPL on February 5th and 6th, 1997.  And also by not deducting from his S. Cowen account money used to buy AXPL stock on February 3, 4, 5 and 6th 1997. Thus, this had the effect of reducing profits in the Vector Keel account by $595,609 and increasing the profits to Franklin and IPO by the same amount, $595,609.

19

This can be shown on page I of the summary sheet for 371:

|  | Number of Shares sold | Realized Profits (Losses) |
|---|---|---|
| Union Securities Vector Keel | 100,000 | 1,241,539 |
| Matched IPO buys (See Exhibit 373) | -475,000 | 595,609 |
| Adjusted Vector Keel Sales total | 52,500 | 645,930 |

On the last line of Exhibit 371 page 1.

The -595,609 deducted from Vector Keel is added to the totals of Franklin's accounts as follows:

$$\begin{array}{r} \$1,240,000 \\ \text{Plus "matched trades" for another} \quad \underline{595,609} \\ \text{For a total } \$1,885,930 \end{array}$$

This falsely made Franklin to appear to only have sold AXPL shares from January 20, 1997 though May 30, 1997.

It also made it falsely appear that the Franklin's accounts made by far the largest money in AXPL stock trading.

This distortion of the so called profits of $1,240,000, this dramatic escalation of so called profits was achieved by summarily disregarding the $595,609 in purchases by IPO on the basis that they were in his opinion "matched transactions" or wash transactions.

This opinion was based on his comparison of trades on specific days in AXPL stocks as concerns the Vector Keel account and the four accounts controlled by Franklin.

In other words if Vector Keel sold 10,000 share of AXPL stock on February 3rd 1997 and IPO Consultants bought 10,000 shares on the same day this was a "matched trade" or a collusive transaction.

The problem with this opinion testimony is that there is no factual basis for the opinion.

Matched trades are not physically possible on the OTC market unless records from the National Securities Clearing Corporation ("NSCC") are reviewed for stock transactions during all relevant times. The NSCC is the organization that cleared and transferred AXPL stock at the times relevant to *Summary Exhibit* 371.

Secondly, on each and every day where there was a claim of a matched transaction, the volume of AXPL shares being traded far exceeded the number of AXPL that Vector Keel sold or IPO bought on that day.

The opinion testimony of Lowry brought the following as concerns the NSCC function. *See* T.III, p. 431-435, 436, 1-10.  This is shown by the following trial record during cross examination by attorney Garrison:

"Q.  Did you look at any transfer agent records that would
show which share certificate IPO in fact purchased on
those 10,000 shares sold on February 3rd, 1997?
A   I think I will try to explain my answer again.
The trades are settled at NSCC, National Securities
Clearing Corporation.  So SFI, or Cowen is the clearing
firm, would have received shares in its account at NSCC,
and union securities would have had shares taken from its
account at NSCC.  And those shares would be in street
name.
Q. What documents have you looked at that reflect what
you just said?
A. The only documents that would reflect that settlement
or the net settlement would be PROVIDED by National
Securities Clearing Corp., and based on -- based on what I
was using, the data or the data from the accounts, that
wasn't necessary to prepare my schedule." (Emphasis
added) See T. III, p.435, 1-25; p.436, 1

Thus here the expert admits that the only basis for his opinion testimony
as to the "matched trades" lies in the records from the NSCC that he has not
seen or examined.

This brings up a second problem with this experts opinion as to
matching trades.  The problem here concerns total volume traded in AXPL on
specific days.

Mr. Lowry produced Exhibit 373 a document called IPO Consultants
and Vector Keel's matched transactions.   His opinion of matched transactions
was based on a five day analysis of trading volume in AXPL stock for
February third 1997 through February sixth, 1997.  Since IPO Consultants
bought 47,500 shares it is opined by Mr. Lawry that Vector Keel sold the
47,500 and thus he arrived at the conclusion that these were "matched trades".

22

TOC

However, the Bloomberg trading records Exhibit 89 BLBG 006 shows the volume of AXPL shares during that five day period of time mentioned was 240,400 shares.   This makes share matching, trade matching not possible. Since the total shares traded exceeded the alleged collusive trades by four and a half to one. *See Exhibit* 89 BLBG 006

Here is what Mr. Lowry said under cross examination to Mr. Garrison, Sam Wolanyk's attorney on page 434-5.  It should be added parenthetically that he arrived at the conclusion that on February 3, 1997 that since Vector Keel, Ltd. sold 10,000 shares of stock and IPO Consultants bought 10,000 shares that these were matched trades even though the Bloomberg records Exhibit No. 89 BLBG 006. Showed 133,000 shares traded that day.  This is the common methodology that he used in arriving at his opinion as to all the so called matched trades:

> "Q.   Okay.  I am not going to go through all of these, if you are looking at exhibit 373, the first matched transaction is February 3rd, 1997.
>      And can you tell me, Mr. Lowry, what was the sales volume of stock on that day?
> A.  133,300 shares.
> Q.  So with respect to that 10,000 shares of stock that was purchased by AXPL, you can't tell this jury with certainty that Mr. Franklin -- Mr. Franklin's entity, IPO, purchased the vector keel shares, correct?
> A.   No, that IS not -- that wouldn't be necessary, and no I couldn't.
> Q.  You got two answers there.  Just to be clear, you could not tell on February 3rd of 1997 when Mr. Franklin's entity IPO purchased the 10,000 shares, who of that 133,300 share volume, those shares were purchased from; is that correct?

23

27

A.   That's correct.

Q.   And is there any document that you had summarized yesterday that would tell you exactly whose AXPL shares Jim Franklin's entity purchased on February 3rd, 1997, those 10,000 shares?

A.   The shares would have been purchased from -- may I have a moment?

Q.   Yes.

A.   The shares would have been purchased in IPO consultants account at SFI investments.  And those 10,000 shares would have been purchased in street name -- shares would have been in street name.  shares That are bought and sold by broker/dealers are in street name.

So the transactions would be settled at the National Securities Clearing Corporation in a net basis so that one broker/dealer buying and another broker/dealer selling. There would be no matching up of the certificates, the trades would all be in street name, and the SFI account would have received shares and the Union Securities account would have had shares taken from its account AND received money.

The settlement is done on a netting basis at NSCC, so there is not an actual pairing up or delivery of securities between broker/dealers".   *See* T. III, p. 433, 11-25; 434, 1-17.

Thus, the summarization based on page one of seven page Exhibit 371 is based upon his opinion, his expert opinion that certain enumerated transactions involving Vector Keel and Franklin's IPO Consultants accounts were collusive, that is to say matched when in fact the only way that he might have accurately testified as to the "matching trades" would be in reviewing the NSCC records that he didn't examine.

Moreover the expert constructed his summary charts to distort the total trading pattern so as to falsely show a "pump and dump" scheme. He did this by omitting one stock from the seventeen profiled by Red Hot Stocks.

Vector purchased 40,000 shares of stock called in Casmyn Minerals in seven separate purchases from June 3rd, 2007 until June 20th, 2007 for a total investment of $117,600 and then sold 20,000 of these shares on July 22nd 1997 for a total of $120,000. Vector keel continued buying over 300,000 shares over the successive 8 months for a total of $669,000. See Exhibit 203.

Casmyn was profiled by Red Hot Stocks on June 27th, 1997 and again on October 11th, 1997. The Casmyn stock plummeted in value and by December of 1997 it was selling at one cent per share: Over $669,000 was lost by Vector Keel in that security. See Exhibit 385.

Yet, this stock was not a party of the summaries presented by Mr. Lowry. Leaving out this devastating loss wholly and radically eliminated a key piece of evidence that would have controverted the Commissions theory that Red Hot Stocks was a pump and dump scheme. In reality once the matched trades are eliminated and the Casmyn loss is included the "pump and dump" activity theory is largely discredited. Thus page one of summary exhibit 371 is wholly inaccurate and a distortion of the facts.

The Commission's expert gave no credible reason for this omission of Casmyn stock. Lowry first stated under cross examination by attorney Garrison that he was interested only in the trading behavior of stocks that had

25

been profiled within a thirty day period of each stock being profiled on Red
Hot Stocks. *See* T.III, p.457, 1-12.

However as was brought out by attorney Garrison Lowry included the
trading behavior for AXPL in his summary sheets way beyond the alleged
thirty day period of time. *See* T.III, p.474, 9-25; p.475, 1-5.

In any case, expert Lawry's methodology had the effect of utterly
distorting the alleged profits of Vector Keel and Franklin. *See Exhibit* 371,
Page 1.

It is axiomatic that under evidence code 1006 there are four
requirements that form the basis for the entry of summarized writings:

> First, the summarized writings must be so *voluminous* so
> as to be unable to be conveniently examined in court.
> *United States v. Duncan,* 919 F.2d 981, 988 (5th
> Cir.1990); *United States v. Robinson,* 774 F.2d 261, 276
> (8th Cir.1985). Second, the underlying evidence must
> itself be admissible. *Martin v. Funtime, Inc.,* 963 F.2d
> 110, 116 (6th Cir.1992); *United States v. Johnson,* 594
> F.2d 1253, 1255 (9th Cir.1979). Third, the original or
> **\*233** copies of the summarized writings must be made
> available to the opposing party. *Hackett v. Housing
> Authority of San Antonio,* 750 F.2d 1308, 1312 (5th
> Cir.1985); *United States v. Kim,* 595 F.2d 755, 764
> (D.C.Cir.1979). And, fourth, the proposed summary (or
> chart or calculation) must accurately summarize (or
> reflect) the underlying document(s) and *only* the
> underlying document(s). *Vasey v. Martin Marietta Corp.,*
> 29 F.3d 1460, 1468-69 (10th Cir.1994); *United States v.
> Drougas,*

*See Bath Iron Works v. US*. 24 Fed Cl 218

In the case at Bar there are two objections to the plaintiffs summary statement. 371.

Lowry was not qualified as an expert nor was he called as an expert but he still gave expert opinion testimony as to "matched trades" invading the province of the jury.  As a summary witness he was supposed to have limited himself to preparing summaries of voluminous records and testifying about such.  Instead he expressed expert opinions concerning ultimate factual findings that only the jury could make.  And those opinions were baseless as to those areas of his testimony already addressed herein.

There is a fifth circuit case on point here:  *See US v. Rodalton Hart* 295 F.3d 451.

In this case the defendant was charged with making false statements on Federal Farm Loan applications.  The central issue for the jury to decide was what debts he should have declared on the farm loan applications'.

The U.S. called a "summary witness" but did not call an expert to give an opinion as to what debts should be listed on the loan application.

The court reversed stating "there must be supporting evidence [that] has been presented previously to the jury to establish any assumptions reflected in the summary" *See United States v. Means* 695 F.2d 81…

Prior to the testimony of Shelly Davis, the government failed to present any evidence whatsoever that the debts Ms. Davis included in her five separate summaries (which were five Farm and Home Plan forms) *should actually have been reported in the categories she selected, should even have been reported in the five Farm and Home Plans at \*456 all,* or *even the proper amounts of such debts that should or should not have been reported on the Farm and Home Plans.* [Emphasis added.]

The court then described the functioning of summary witness Davis:

In short, it is apparent to us that Davis functioned as the government's sole expert witness regarding the proper preparation of (1) FHPs generally, and (2) the Hart brothers' FHPs in particular, thereby unquestionably exceeding the scope of FRE 1006.

This is not a case in which the criminal defendant successfully raised an objection grounded in insufficiency of the evidence. FN17    Instead, the gravamen of Rodalton's appeal is that the district court erred in allowing the government, through Davis, to present expert testimony in the guise of summary evidence.    This is reversible trial error, for which the proper remedy is a remand for a new trial.    As the Supreme Court has stated:

The government here through the use of Lowry used a summary witness as an expert to give conclusionary opinions as to ultimate facts that should have been for the jury to decide.

The non inclusion of the six hundred sixty nine thousand dollars in losses for the Casmyn trading created a distortion as to monies gained and

lost. It also eliminated from the jury's consideration strong evidence showing there was no pump and dump scheme.

The analysis so far made goes a fortiori to the fourth qualifying requirement the proposed summaries must accurately summarize or reflect the documents being reflected in the charts. *See Vasey v. Marietta Corp. (10th Cir. 1994); United States v. Dougas* 748 F. 2d 8 (1st Circuit 1984). As has been shown and illustrated the Lowry opinions were inaccurate. Thus on the ground it was reversible error to let them in.

In the case before the court Lowry expressed opinions that gravely prejudiced Franklin. He was an expert expressing opinions in the guise of an 1006 Evidence Code Witness. These opinions went to ultimate issued that should have been decided by the jury.

This alone was reversible error.

II. **TWO MONTHS BEFORE THE TRIAL AND AFTER THE DISOVERY CUT OFF DATE THE COURT ALLOWED THE COMISSION TO PLACE INTO EVIDENCE AND PUT IN EXHIBITS AS TO NINE MORE PROFILED COMPANIES MORE THAN DOUBLING FRANKLINS TRIAL PREPARATION BURDEN AND LEAVING HIM WITH THE TASK OF PREPARING FOR A SUBSTANTIALLY ENLARGED CASE WITHOUT THE BENEFIT OF DISCOVERY.**

The Commission on July 29th, 2005 filed an in limine motion asking that the court allow in at trial evidence and exhibits as to nine more profiled companies. D-330.

On august 19th, 2005 the Commission at a hearing argued that
additional evidence and exhibits should be admissible at the October 17th,
2005 trial.  They sought to put into evidence about nine additional Red Hot
Stocks profiled companies.

Casmyn Corporation ("CSMN") 2 reports emailed June 27, 1997 and
published July 3rd, 1997 and; October 11, 1997 and published October 17th,
1997. Exhibits 236 and 686, Georgian Bancorp, Inc. ("GRBE') emailed
August 29th, 1997 and published September 3rd, 197 (Exhibit 237/649),
Grand Havana Enterprises, Inc. ("PUFF") emailed September 26[th], 1997 and
published October 2[nd], 1997 (Exhibit 238), Brighton Technologies Corp
("BRHT") 2 reports October 30[th], 1998 published November 5[th], 1998 and;
March 18, 1999 and published March 25[th], 1999. (Exhibits 577, and 588), Q-
Seven Systems ("QSSY") 3 reports emailed on July 13[th], August 5[th] and
August 11th, 1999. Exhibit 594, Bates Nos. EGXX 0045-0061), Pay for
view.com ("PAYV ") 2 reports emailed June 26, and July 6, 1999 (Exhibit
594, Bates Nos. EGXX 0031-0037,0042-0045, and 0061-0064,
Browsesafe.com ("PGPG')  7 reports emailed August 10, August 10, August
13, August 19, September 1st, September 21st and September 25th, 1999.
(Exhibit 594, Bates Nos. EGXX 0045-0061, Whatsforfree ("WFFT") 2
reports emailed February 28th and March 7th, 2000 (Exhibit No. 589), and
TechLogistic.com ("TLOS") (Exhibit 594, Bates Nos. EGXX 0074-0079.
*See* D-330.

The granting of this petition to the Commission accomplished many
things for it.  It larded up the complaint with highly prejudicial evidence and

exhibits. The defense had to spend a great deal of time away from preparing the case as to the eight original companies. This immeasurably weakened the defense causing it to lose focus and spread itself too thin moreover the defense was deprived of F.R.C.P. discovery since the discovery cut off had already occurred.

This last minute more than doubling of the claims and evidence and exhibits greatly worked to the advantage of the Commission. It is the State. It has the power of the State. It has vast financial and investigatory resources. It can assign teams of attorneys, investigators and paralegals in a short period of time to accomplish a great many things that only the wealthiest of civil litigants can match.

More than doubling the task of the defense by more than doubling its preparation burden seven weeks before trial in a complex civil fraud case involving more than 30,000 thousand pages of exhibits and 459 exhibits bespeaks of Judicial abuse of discretion. *See* T.XI, p.2043, 8-16; D-413.

Appellant concedes states that the Commission had no statute of limitations under any Federal Security Law. Neither is it bound by States statutory of limitations law. Thus even though the profiles on the added companies appeared six and seven years before, no statute of limitation precluded this.

The Commissions enabling statute poses no statute of limitations either federal or state on purely injunctive and disgorgement actions.

However, the Supreme Court stated in a leading case that Federal
courts have inherent power to fashion appropriate equitable remedies
involving inequitable conduct by government agencies exercising extremely
broad power by way of congressional mandate:  See *Occidental Life
Insurance v. Equal Employment Opportunity Commission.* 97 S.CT 244 Fd.
432 U.S. 355.

In that case the employer claimed that the enabling statute for the
EEOC imposed a statute of limitations for agency filings against employers
and failing that state statutes of limitation were applicable to federal
agencies when the congressional mandated mentioned no statute.

Hon. Justice Stewart rejected the petitioners claim but his opinion
contains important much cited obiter dicta about the Federal Courts inherent
power to equitably dismiss agency filings that are unjustifiably tardy.

> It is, of course, possible that despite these procedural
> protections a defendant in a Title VII enforcement action
> might still be significantly handicapped in making his
> defense because of an inordinate EEOC delay in filing the
> action after exhausting its conciliation efforts. If such
> cases arise the federal courts do not lack the power to
> provide relief. This Court has said that when a Title VII
> defendant is in fact prejudiced by a private plaintiff's
> unexcused conduct of a particular case, the trial court may
> restrict or even deny backpay relief. *Albemarle Paper Co.
> v. Moody*, 422 U.S. 405, 424-425, 95 S.Ct. 2362, 2374-
> 2375, 45 L.Ed.2d 280.  The same discretionary power "to
> locate 'a just result' in light of the circumstances peculiar
> to the case," ibid., can also be exercised when the EEOC is
> the plaintiff.

Justice Stewart found no equitable prejudice to a three year filing after
an employee's initial complaints by the EEOC since the employer had been
fully informed about the EEOC investigation all along.  Also one can add
the Occidental's discovery rights were not curtailed.  It had the means and
power to mount a full defense.

Here there is massive prejudice to defendant Franklin.  He is to defend
himself in a complex civil case without discovery rights as to nine new
companies.  And this is less than two months before trial.

Moreover this case asks for more than injunctive relief.   It asks for
civil penalties.  It thus appears that the statute of limitations under U.S.C.
2462 had run as to the nine companies as of August 2005 since more than
five years had elapsed since Red Hot Stocks did a profile on each of the
companies.  Exhibits D-330 and 385.

Moreover the Commission itself appears to accept that reasoning.

The Commission argued in the case of *SEC. v. Tandem Management.,
et al 2001* U.S. Dist Lexis 19109 that U.S.C 2462 doesn't apply to it since in
the Tandem case it was only asking for injunctive relief.

Since the complaint asks for more than injunctive relief under U.S.C.
2462 the case the case against the nine additional companies profiled is
barred since all the profiles appeared more than five years prior to the
August 19, 2005 order allowing evidence and exhibits to be presented by the
Commission at trial.       This is a separate independent ground for reversal.

TOC

# EXHIBIT E

Declaration of James E. Franklin
(attached)

IN THE UNITED STATES DISTRICT COURT

For the Southern District of California

**JAMES E. FRANKLIN,**
   **Plaintiff,**

**v.**                               **Case No. 02cv84 IEG (RBB)**

**SECURITIES AND EXCHANGE COMMISSION,**
   **Defendant.**

DECLARATION OF JAMES E. FRANKLIN

IN SUPPORT OF MOTION FOR RELIEF FROM FINAL JUDGMENT

(FED. R. CIV. P. 60(b))

I, James E. Franklin, declare under penalty of perjury:

1. I am the Defendant in the above-captioned matter. I make this declaration in support of my motion for relief from the final judgment under Rule 60(b) of the Federal Rules of Civil Procedure.

2. I was alleged by the SEC to have participated in a stock promotion scheme related to an online newsletter called Red Hot Stocks. I was not the publisher of that newsletter, and I never received any direct compensation for coverage of any companies mentioned in it.

3. In 2002, I was sued by the SEC in connection with these allegations. The SEC claimed I had engaged in fraudulent trading practices, which I have denied from the beginning. The case was civil only; I was never criminally charged.

4. At trial in 2005, the SEC introduced summary charts and testimony that omitted critical losses I had suffered in the market, including a $669,000 loss in Casmyn stock. This created a misleading impression that I had only profited through a pattern of manipulative trading.

5. The SEC also called a co-defendant, Dieter Raabe, as a surprise witness during trial after granting him immunity without prior notice. I was denied an opportunity to depose or prepare to cross-examine him. The trial court refused a continuance, and I was left unable to adequately defend myself.

6. In 2024, I became aware of multiple letters written by my former attorney, Stephan Jan Meyers, a former SEC Enforcement Attorney. In these letters, Mr. Meyers details misconduct by SEC lawyers, including:

  - Misleading the Court into believing I was under criminal investigation (I was not),

  - Disclosing confidential investigatory details to a third-party attorney in a private civil matter,

  - Using questions from a separate SEC case to conduct an unauthorized deposition after discovery had closed,

  - Attempting to fabricate an obstruction charge through a mischaracterization of witness testimony.

7. Mr. Meyers reported this misconduct to the SEC Commissioners and to the Department of Justice. I was never informed of these letters or their content at the time of trial or appeal.

8. As a result of the judgment, I have suffered two decades of continuous reputational harm. When my name is searched on Google, outdated and misleading content appears portraying me as a securities fraudster. These results have cost me jobs, opportunities, and basic human dignity.

9. I am now indigent. I have been unable to seek or maintain employment, unable to raise capital for any legitimate business use, and unable to support my family. I am continually excluded from professional, financial, and community opportunities.

10. I make this declaration in support of my motion because I believe that had the jury and the Court been provided a fair and accurate trial—without surprise witnesses, undisclosed misconduct, and prosecutorial overreach—the result would have been different.

I declare under penalty of perjury under the laws of the United States that the foregoing is
true and correct.


Executed on:  04/04/2025


Respectfully submitted,

_____
James E. Franklin, Pro per
1212 H Street, SPC #125
Ramona, CA 92065
Plaintiff, Pro Se
720-771-0140
jayvonfrank@gmail.com

# EXHIBIT F

March 11, 2004 letter from Stephan Jan Meyers to SEC Director of Enforcement

# STEPHAN JAN MEYERS, ESQ.

Suite 131
204 NO. EL CAMINO REAL
ENCINITAS, CALIFORNIA  92024

CELL:  (858) 922-2006
FACSIMILE:  (760) 454-2336
EMAIL:  Steve@smeyers.com

### LITIGATION PRIVILEGE
### COMMON INTEREST PRIVILEGE

VIA FACSIMILE
202-942-9636
(Hard Copy to Follow)

March 11, 2004

Stephen M. Cutler, Director
Division of Enforcement
Securities & Exchange Commission
450 Fifth Street, NW
Washington, DC 20549

RE:    Complaint regarding activities engaged in by SEC Staff Attorneys
And Request for Investigation

Dear Mr. Cutler:

For over 25 years, I have been proud to list on my résumé that I began my legal career as an Enforcement Attorney with the SEC's San Francisco Branch Office.  Until now.  Now, after what I've seen over the past year as I assisted a friend charged by the SEC with securities laws violations, I'm ashamed of that association.  As both a former Enforcement Attorney and as a citizen, I'm angry and repulsed by what I've uncovered.  I am committed to determining whether what I've uncovered is rogue behavior randomly engaged in by staff attorneys, or indicative of a systemic breakdown in leadership at higher levels within the Commission.

This letter initially began as a settlement proposal on behalf of James E. Franklin, a defendant in *SEC v. Franklin, et al.*, Civ. Case No. 02cv84 currently pending in the USDC for the Southern District of California in San Diego ("this Case").  As noted below, I temporarily substituted in this Case in mid-2003 after his first trial counsel was terminated.  However, since I began the letter, I have disassociated out.[1]  As a result, I am instead requesting that the Commission initiate an

---

[1]  This is **not** a reflection on the merits of Mr. Franklin's defense.  To the contrary, it is because I have not engaged in a litigation practice since I left the SEC, and had substituted into the case solely as a temporary accommodation to Franklin.  I continue to represent him on several non-related matters.

Stephen B. Cutler
Request to Investigate
March 11, 2004
Page 2 of 12

investigation into the matters raised herein, including apparent knowing violations of Title 18. I do not take this step lightly. I have been a member of the bar for over 30 years, and am well aware that it is more likely that I will become the target of your inquiry long before you consider investigating any of my charges. While certainly I'm concerned, I am not dissuaded and remain confident the truth will prevail.

I also realize that since I no longer represent Franklin in this Case, I am not authorized to discuss settlement with you. Nevertheless, if what I relate persuades you that settlement is the proper course to pursue, please contact Franklin's trial counsel, Darren Quinn, at (619)-232-9400. For the matters raised herein, contact me.

Unfortunately, there were numerous instances of misconduct that I believe occurred in this Case, and I have explained each of them with as much specificity as possible because of the seriousness of this matter. I have provided a summary to guide you through.

1.     **Summary**

A.     18 USC §1905.          During the formal investigation preceding the filing of this Case, the attorney in charge of the investigation appears to have divulged confidential information about Franklin to a friend of hers who, although formerly a Senior Counsel in the Division of Enforcement, was in private practice and representing a party involved in litigation with Franklin. While the information was of course used by the law firm to intimidate Franklin and gain an unfair advantage in that private civil matter, it appears that another purpose was to circumvent the Fifth Amendment rights he had claimed in the SEC investigation. In any case, it certainly served to polarize the litigation.

B.     18 USC §1001; California Rules of Professional Conduct.          This Case was filed in January 2002. Franklin had a new trial attorney. Any possibility of him not asserting and/or waiving his Fifth Amendment rights was obliterated when the new SEC trial attorney responded to the Court's question of whether there were any parallel criminal proceedings by claiming that there were ongoing "law enforcement activities." We believe this was a false statement knowingly made for the improper purpose of compelling Franklin not to waive his Fifth Amendment privilege so that the Commission could invoke the preclusion doctrine and essentially obtain a default judgment against Franklin.

C.     Court Order, Rules of Conduct.          Long after the Court-ordered discovery cut off date in this Case, Franklin's deposition was being taken by another SEC attorney in another, non-related case. The attorney in this Case apparently solicited the other attorney to ask Franklin a series of questions for use in this Case, as the other attorney stated on the record he was going to be reporting back Franklin's testimony. Franklin was appearing in the other deposition in pro per, and although Franklin repeatedly objected to being questioned about this Case, the other attorney relentlessly persisted and induced some answers from Franklin. This violates the Rules of

Stephen B. Cutler
Request to Investigate
March 11, 2004
Page 3 of 12

Professional Conduct that prohibit contacts with a represented party.  It can also constitute the basis
for discipline or disbarment.

       D.     Rules of Professional Conduct, Rules of Court.      As this case recently heated
up as it approached its denouement, the current SEC trial counsel utilized what is a clearly
inconsistent and erroneous statement by a witness and fabricated it into an allegation of obstruction
of justice by Franklin.  The witnesses' statement, taken out of context, conflicts with other
information that was actually generated by the SEC.  Even though this error was pointed out to the
SEC attorney, he ignored the information.

         *             *             *             *             *

**2.**     **Current Case Status.**

     This Case is nearly ready for trial, although no trial date has been set.  The Court has
scheduled a settlement conference for this Friday, March 12, 2004. The Court recently permitted
cross-summary judgment motions by Franklin and the other remaining defendant, Sam Wolanyk, and
by the SEC.  For the most part, all motions were denied, and thus most issues will be resolved by
trial.

     Kenneth Guido, the SEC's current trial counsel on the case, seems to have convinced both
Franklin's trial counsel and the settlement Judge that making a settlement proposal would be a waste
of time as the SEC can not/will not settle on any basis other than obtaining all relief sought.  I am not
of that opinion, and hope that some of the matters raised herein will provoke the Commission to
consider settlement possibilities on a basis other than consenting to every allegation of the Complaint.
While Franklin's trial counsel is growing increasingly confident that he will prevail at trial, Franklin
views with growing alarm the hard costs involved, as well as the uncertainty of outcome that all trials
involve.

**3.**     **My Concerns.**

     This case has become polarized way beyond proportion to its actual impact.  It has resulted
in the filing of a Complaint against Franklin that is replete with innuendo and speculation, as well as
the publication of a litigation release that has adversely affected his family and completely destroyed
his livelihood.  The polarization continues to exert influence today, as it appears to have made the
Commission unwilling to consider settlement unless it achieves the full relief sought by its Complaint.
That is not a "settlement."

     A major instigator for the SEC's high-intensity approach was the assertion by Franklin and
the other defendants of their Fifth Amendment rights.  As a former Enforcement Attorney, I can
understand why the SEC attorneys would regard that act as tantamount to waiving a red flag in front
of a bull.  I can also understand the necessity in such a situation to spare no expense to fully
investigate and litigate this case.  I might even be capable of understanding that one of those
attorneys might take the refusal to cooperate fully as a personal affront, and perhaps push against the

Stephen B. Cutler
Request to Investigate
March 11, 2004
Page 4 of 12

limits of ethical conduct. However, I cannot understand or condone bursting through the boundaries of ethical and legal propriety to the extent that the SEC has in this case.

While Franklin's initial decision to assert the Fifth Amendment may have been ill-advised, certainly it must have appeared increasingly correct and necessary as the SEC continued to trample his rights. overstepped I am confident that if the defendants had not been induced to assert their Fifth Amendment rights, the initial investigation would not have mushroomed out of hand like it did, and we would have been discussing simple issues from the beginning: did any securities laws violations actually take place? if so, by whom? is an injunctive proceeding necessary? Certainly, any case that was filed would have settled long ago with negligible relief being granted.

### A. Why Might Franklin Assert and Maintain His Fifth Amendment Rights?

First, the stage must be set. Act I, Scene 1: All of the factual events underlying this case occurred in the first half of 1997, and the SEC's investigation is about to begin. Scene 2: A formal order of investigation was issued December 7, 1997. All of the defendants asserted their Fifth Amendment rights against self-incrimination. By late 1998, the investigation appears to have concluded. Over 3 years later, on January 12, 2002, with the statute of limitations about to run, Act II commences with the filing of the civil action.

Franklin's assertion of the Fifth during Act I, Scene 2 appears to be a lesson in the impact of poor legal advice.[2] But there is more than that involved here. All three individuals who were named defendants in the injunctive proceedings and at least 2 of the witnesses that were called to testify against them during the formal investigation were represented by the same attorney. While the Commission's Supplemental Information document, Form 1662, indicates that parties may be "represented by counsel who also represents other persons involved in the Commission's investigation," the Commission's acquiescence here is particularly intriguing.[3] As a matter of law, this attorney could not have simultaneously represented all three individual defendants and two witnesses unless, at a minimum, all defendants pled the Fifth and maintained that plea throughout all proceedings.

---

[2] He was never advised that taking the 5th was equivalent to issuing a challenge to the SEC. He believed he had done no wrong, and instead was induced to adopt this ill advised course of action. "Preclusion" and its potentially devastating impact were never mentioned to him.

[3] Since any investigation of the attorney involved, who apparently was the former SEC litigation chief from the Los Angeles Regional Office, is beyond the scope of the request of this letter, matters concerning him will not be pressed here. I note, though, that no conflicts of interest waivers were discussed by or executed with this attorney, in apparent violation of the California Rules of Professional Conduct. Further, my informal inquiry indicates that ,many of his clients do take the Fifth and ultimately consent to injunctions, thereby providing the local Regional Office with a steady supply of easy judgments.

Stephen B. Cutler
Request to Investigate
March 11, 2004
Page 5 of 12

More important here is the seeming conflict between the multiple representation permitted by Form 1662, and the provisions of Rule 7(b) of the Commission's Rules relating to the conduct of investigations, 17 CFR 203.7(b).  This Rule limits the broad sweep of Rule 102(e) of the Commission's rules of practice by adding the proviso "That all witnesses shall be sequestered, and unless permitted in the discretion of the officer conducting the investigation no witness or the counsel accompanying any such witness shall be permitted to be present during the examination of any other witness called in such proceeding."

The second event that occurred during Scene 2 is what appears to be a clear and knowing violation of 18 USC §1905 by the staff attorney then in charge of the investigation:  Helaine Schwartz.  Again to set the stage:  In 1995, long before anything remotely related to the SEC case was even a figment of anyone's imagination, Franklin had filed a lawsuit in California state court against a company named Med-Search, Inc.  He lost the case, and the Court awarded Med-Search substantial legal fees.  On June 16, 1998, Med-Search took a judgment debtors examination of Franklin to locate assets upon which Med-Search could levy.

After 131 pages of routine questions based largely upon notations in ledgers and check registers, asking mostly "why was this person paid?" and "Do they owe any money to you" type questions, there was a startling and abrupt shift to questions concerning Red Hot Stocks, which was the name under which the formal investigation preceding the filing of this Case was conducted.  These questions do not reference ledgers as their source, nor are any follow-up questions asked to locate assets upon which a levy and seizure could be made.  Instead, Franklin is asked to answer the same key questions that Franklin was still taking the Fifth on in the ongoing supposedly "non-public" formal proceeding:[4]  "Who operates Red Hot Stocks? … Do you have any connection with that web site? … Are research reports [concerning companies with which you are involved that Red Hot Stocks profiles on its web site] prepared by you?"  (*See:*  Exhibit A attached hereto for a true and correct copy of the relevant pages of the official transcript of the examination.)

Helaine Schwartz, the attorney conducting the investigation in this Case, was the person who leaked this information to the private attorneys expressly for the purpose of use against Franklin.  How do we know?  The Med-Search attorneys told Franklin so!  On several occasions, Franklin was told of the relationship between one of the law firm's attorneys, Deborah A. Klar, and Ms. Schwartz.  He was told that Klar was a former SEC attorney in Washington, and while so employed had become close buddies with Schwartz.  Indeed, Ms. Klar's on-line resume at her current firm states that she formerly was "Senior Counsel in the Division of Enforcement of the Securities & Exchange Commission, Washington, D.C."  All of the communications about this special relationship with Ms. Schwartz were utilized for coercive purposes.  For example, just before his debtor's exam, Franklin had made a settlement proposal to Klar's firm.  At a break in the examination, which the

_____

[4] 17 CFR 203.5

Stephen B. Cutler
Request to Investigate
March 11, 2004
<u>Page 6 of 12</u>

record indicates Klar attended in the afternoon, Klar admitted her close association with Schwartz, and that she was the source of the questions. Furthermore, Klar specifically stated to Franklin that through Schwartz she was familiar with the SEC's investigations of Franklin, and that he was in "really deep shit." As a result of this knowledge, they were refusing to consider his settlement offer.

Even without the admissions by both Klar and her law partner, a simple examination of the questions asked of Franklin make the link to Schwartz obvious. Based upon the hundreds of questions previously asked of Franklin during that examination, we would have expected the question of "Have you ever paid any money to the operators [of the web site]?" to be followed by "Do they owe you any money?" But it wasn't! Instead, Franklin is next asked: "Have you ever prepared any of the items that get published … on that web site?" What could the answer to that question possibly have provided of any benefit to the Med-Search attorneys? Absolutely nothing!

It should also be noted that the first question Franklin is asked about Red Hot stocks is not as innocent as it first seems: it is worded in the precise language needed to establish a key liability element under §17(b) of the Securities Act: that Franklin paid Wolanyk to publish the Company profiles on the Red Hot Stocks web site.[5] But in a debtor's exam, the only relevant question is whether he was owed money by Red Hot Stocks. This omission is indicative of the improper activity by Ms. Schwartz.

Section 1905 of Title 18 of the United States Codes criminalizes Schwartz' conduct. It provides, in pertinent part, essentially as follows:

> Whoever, being an officer or employee of the United States or of any … agency thereof … divulges, discloses, or makes known in any manner not authorized by law any information coming to him in the course of … any examination or investigation made by … such agency or officer, which information concerns or relates to the operations, or to the identity, amount or source of any income, profits, losses, or expenditures of any person, shall be fined not more than $1,000, or imprisoned not more than one year, or both; and shall be removed from office or employment.

Finally, Exhibit B attached hereto provides further evidence confirming the admitted link to Schwartz. It is one of the billing sheets that Klar's law firm filed in support of its motion for attorneys fees. While this sheet, like many others, contains redactions that they refused to explain to Franklin, they failed to redact the June 3rd entry by Kenneth E. Johnson, the partner in charge of this case and the one conducting Franklin's examination. It states that some portion of his 3.75 hour entry was consumed by a "telephone conference re: investigation of enforcement issues." Unlike every other entry on that sheet, the identity of the party with whom he communicated is <u>not</u> revealed. While he might try to claim that "enforcement issues" pertains to enforcement of a judgment (even after he

---

[5] One of the elements that must be established to establish liability under Section 17(b) is that the security was promoted "for a consideration received or to be received, directly or indirectly, from an issuer, underwriter, or dealer, without fully disclosing the receipt, whether past or prospective, of such consideration and the amount thereof."

Stephen B. Cutler
Request to Investigate
March 11, 2004
Page 7 of 12

tried to coerce a more favorable settlement out of Franklin by acknowledging the connection with Klar), I'm positive it refers to inquiries about SEC enforcement activities: one does not have a phone conference to "investigate" how to enforce a judgment!

And of course the negative impact it had on this Case is that it became a defining moment for Franklin whenever he considered waiving or not asserting his Fifth Amendment rights: knowing that the Government will use every opportunity to drag you down, it's better to keep silent than to give them any evidence that can be twisted against you. Where did Schwartz learn this behavior? Did she make it up on her own, or is it part of the new training modules that have been instituted at the SEC since I left?

**B.      More Improprieties; More Reasons to Continue to Assert Fifth Amendment Rights.**

Unfortunately, the SEC staff used many more improper and coercive activities that seem designed for only one purpose: to intimidate the targets into either confessing, or forcing them to continue to assert the Fifth until preclusion becomes a certainty and the resultant default injunctive decree is guaranteed.

Act II, Scene 1: After a 3-year hiatus during which Franklin heard nothing from the SEC, the Commission filed an unverified complaint for injunctive relief on January 12, 2002, and posted a litigation release for world-wide consumption that equated Franklin with internet fraud. Franklin had a new attorney, his former one now representing another one of the defendants. It was a unique opportunity for Franklin to consider making new choices, and play the game out in the open under the Federal Rules of Civil Procedure, not cloaked Commission policies. The ENE conference was held the next month, where Franklin first met Glenn Harris, the first SEC Trial Attorney assigned to this case. Harris' first impression on Franklin was profound: in response to a question from the Magistrate as to whether any parallel criminal proceedings were ongoing, Mr. Harris replied: "There are some law enforcement activities."

Put yourself in the position of Franklin and/or his attorney. Franklin's course was sealed. There was only one response for Franklin's attorney that wouldn't result in a malpractice claim when a government attorney in a civil proceeding implies that there are parallel criminal proceedings against your client: have the client take the Fifth (which is what Franklin's attorney instructed him to do at deposition).

Was what Harris said true? Were there actually then "law enforcement activities" pending? What does that phrase mean? Certainly Franklin was never aware of any law enforcement activities. He received no indications from friends or enemies that the FBI or any other investigators were making inquiries about him. No sense of being followed. No requests for information. Nothing. What if there really were no law enforcement activities? What if Harris just made it up? Could that possibly have happened?

Stephen B. Cutler
Request to Investigate
March 11, 2004
<u>Page 8 of 12</u>

When I was first retained by Franklin to act as a placeholder until he could secure an experienced trial counsel, I ended up (through a strange but ultimately fruitful mix-up) speaking with an experienced attorney at the Federal Public Defender's Office in Los Angeles. As I tried to explain the situation, I was unable to recall the particular phrase that Harris had told the court. As I kept stumbling around, she asked me: "Was it 'law enforcement activities'?" I experienced a chill down my spine: could it possibly be that the SEC had a practice of making these kinds of false statements? She explained that she was familiar with that phrase being used by the government in similar situations, and her agency was also having problems as a result. She indicated that this would be difficult to prove, but if Franklin had not been made aware of any of the indicia that typically surround a criminal investigation, then it was more likely than not that none had occurred.

Are SEC trial attorneys now being programmed to say this phrase? It's a brilliant technique when the case is a dog and you need to rely on preclusion for a victory. Brilliant technique, but fundamentally repulsive!

Except for 18 USC. §1001, which provides that "Whoever, in any matter within the jurisdiction of any department or agency of the United States knowingly and willfully … makes any false, fictitious or fraudulent statements or representations … shall be fined under this title or imprisoned not more than five years, or both." Certainly if Harris knew the statement was false, it would violate §1001. And even if the situation was only that he didn't know whether it was true and nevertheless uttered it as a true statement, he could be violating Rule 5-200 of the California Rules of Professional Conduct. That Rule relates to trial proceedings, and provides that in presenting a matter to a tribunal, a member:

(A) Shall employ, for the purpose of maintaining the causes confided to the member such means only as are consistent with truth;

(B) Shall not seek to mislead the judge, judicial officer, or jury by an artifice or false statement of fact or law;

## C.   <u>Full Participation by Government Attorneys.</u>

There's more: you don't even have to be assigned to this case to have an opportunity to violate ethical and judicial standards! The Scene: it's October 2, 2003, and the SEC is taking Franklin's deposition in SEC v. Cavanaugh, 98 CIV. 1818 (DLC), a case pending in the Southern District of New York that had nothing to do with this Case. Franklin had been a relief defendant in that case, but when knowledge of this Case became more widespread, his status was escalated to that of a regular defendant. By October 2, 2003, the discovery cut off date in SEC v. Franklin had long since passed, but that apparently was of no concern to Kenneth Guido, the SEC trial attorney who replaced Mr. Harris. He appears to have induced or directed Michael K. Lowman, the SEC Staff attorney conducting the deposition in the *Cavanaugh* matter, to clear up a few loose ends that he hadn't been able to resolve in the *Franklin* case.

Stephen B. Cutler
Request to Investigate
March 11, 2004
<u>Page 9 of 12</u>

As noted in Exhibit C attached hereto, which consists of the relevant portions of the October 2 deposition, Mr. Lowman was an eager participant in bypassing the Court's discovery cut-off order, repeatedly posing questions to Franklin that had nothing to do with the *Cavanaugh* case. He even admits he's going to turn over Franklin's testimony to his colleagues, a clear violation of the Court's discovery cut off date in this Case[6]. Indeed, his enthusiasm also appears to have blinded him to the requirements of Rule 2-100 of the California Rules of Professional Conduct, which prohibits contact with a represented party. Even though Lowman acknowledges that Franklin's attorney in the *Franklin* Case is not present, and that it would be more proper to wait until he was present, he just can't reign in his enthusiasm and states: "But I want to just get a chance to ask you a couple of questions." (p. 152, line 5 – p. 153, line 1.) And ask them he does!

Lowman claims they merely relate to the standards for imposing injunctive relief, but that is not true. Over Franklin's repeated objections and invocations of the Fifth Amendment, Lowman continues to hammer him with threatening questions such as:

> "Isn't it true that after Mr. Brooksbank received that subpoena for those documents, you instructed Mr. Brooksbank to send those documents to an address in the Turks and Caicos Islands?" (Transcript, p. 154, lines 5-8)

Of course, what Mr. Lowman actually was doing was attempting to intimidate Franklin (outside of the presence of his trial counsel), as Guido was apparently already formulating a plan to use an ambiguity and/or clear mistake in Brooksbank's testimony to try to fabricate an obstruction of justice charge against Franklin, and Guido had clearly been rehearsing it with Lowman. (See: Subsection D, following.) Even Brooksbank, who was at the deposition, was objecting to the mischaracterizations. And if that wasn't enough, Lowman pressed on with another series of questions to Franklin designed for further intimidation, incorrectly suggesting he had committed bankruptcy fraud.[7] The actions of both Guido and Lowman constitute clear violation of this Court's Order establishing the discovery cut off date. Moreover, Lowman's actions in pressing forward with the deposition of a represented party when that party's attorney was not present, violates State Bar

---

[6]    Cavanaugh Transcript, Page 151, lines 24-25: "granted what you tell me will go to my colleagues" on the Franklin Case.

[7] Lowman's assertion, clearly made to intimidate Franklin when his attorney was not present, is flat-out wrong. He challenged Franklin by essentially accusing him of Bankruptcy fraud by "intentionally fil[ing] an incomplete bankruptcy petition." Having practiced in the bankruptcy law field myself, I am familiar with the practices therein, and a significant portion of bankruptcy filings are intentionally filed as "incomplete," as they are filed on an emergency basis to stop a foreclosure and the like. There is even a standard term for these incomplete filings: "skeleton petitions."

Stephen B. Cutler
Request to Investigate
March 11, 2004
<u>Page 10 of 12</u>

requirements. His communications are precisely the type for which the Rule was enacted: while
proclaiming an innocent intent, he engaged in rank intimidation!

      I'm again forced to inquire whether this is yet another new training module that the SEC has
implemented since I left its ranks. It's repugnant, but will remain highly effective until such acts are
subjected to severe disciplinary proceedings and/or disbarment.

### D.     <u>Fabricating an Obstruction of Justice Charge.</u>

      Unfortunately, there is more. Guido has taken an obvious mistake in Brooksbank's
deposition (the use to which even Brooksbank objected in *Cavanaugh*[8]) and is trying to parlay it
into an obstruction of justice charge. Even if his tactics are later discredited, as they will be, he has
nevertheless been able both to create an extremely bad impression of Franklin for the new judge that
was just assigned to the Franklin Case, as well as create an opportunity to call in the FBI to
investigate Franklin, which apparently has already occurred.

      Here is how Guido did it. On June 30, 1998, Brooksbank was questioned about a 1-page
memo dated July 15, 1997, that he received instructing him to send all of the Net Income files to the
Turks and Caicos Islands. (A copy of that memo is attached hereto as Exhibit D.) Brooksbank
states that Franklin called him "about a year ago, last summer" and told him to send the papers to
those islands. When asked why, Brooksbank (erroneously) answers:

> [A] "I believe that was in response to a letter from the SEC from Rowley or an inquiry or
> something. He said I want you to send all the stuff over."
>
> [Q]: Because the SEC was investigating?
>
> [A]: I think so.
>
> [Q]: Did he say anything else about that?
>
> [A]: No."

      Brooksbank was clearly in error, and if called as a witness will be correcting this testimony.
Why was he wrong? Because "about a year ago, last summer" would be June 1997, and there was
no SEC inquiry until early 1998, after the Formal Order was obtained in December 1997.
Brooksbank had two contacts with Franklin that are at issue here. In July 1997 when Brooksbank
received a copy of the memo from a third party instructing that the files be shipped out of the
country, he called Franklin and asked what he should do. Brooksbank testified that he received this

---

[8] "MR. LOHMAN: Isn't it true that after Mr. Brooksbank received that subpoena for those documents, you
instructed Mr. Brooksbank to send those documents to an address in the Turks and Caicos Islands?
"MR. FRANKLIN: On advice of counsel, I must consult before I answer that question.
"MR. LOHMAN: Are you aware that Mr. Brooksbank has testified to those events?
"MR. BROOKSBANK: Objection. That mischaracterizes the testimony of myself."
    Transcript, Exhibit C, p. 154, lines 5-14

Stephen B. Cutler
Request to Investigate
March 11, 2004
<u>Page 11 of 12</u>

notice from his local contact, Rowley; there has never been a suggestion that it came to him from Franklin. Nevertheless, Brooksbank erroneously connects this with the time that Franklin called him about the notice he had received of the SEC inquiry, which was 7-8 months later, after the Formal Order was issued and long after Brooksbank testified he sent off the documents to the Turks & Caicos. It was only at that later time that Franklin "instructed" Brooksbank to do anything, and that was to assert the attorney-client privilege on Franklin's behalf in the SEC proceeding.

But besides this obvious discrepancy, Guido's fabrication lacks credibility. Brooksbank is an <u>attorney</u> licensed in Nevada, Montana and Wyoming, among other states. Franklin, on the other hand, is either Brooksbank's client, which Brooksbank tries to deny, or else he's just some "Joe" off the street. In either case, it strains credulity to have us believe that Brooksbank would meekly follow Franklin's "instructions" without exercising any professional judgment. Clearly, <u>if</u> it were true, as he mistakenly suggests, that he <u>was aware</u> of the SEC's investigation at the time he meekly accedes to Franklin's "instructions," I would conclude that it was Brooksbank, as the attorney who is supposed to know better, who is guilty of obstruction of justice! This would be even truer <u>if</u> Franklin were <u>not</u> his client, for then Franklin would not be in any position to "instruct" him to do anything!!

Guido's fabrication cannot be viewed in isolation. Remember, he is the same person who induced Lowman to assist him in violating the Court-ordered discovery cut off date. And there can be no doubt that Guido was feeding the questions to Lowman, as Lowman's question repeats the same error Guido was focusing on. Lowman asked Franklin: "Isn't it true that <u>**after**</u> Mr. Brooksbank received that <u>**subpoena**</u> for those documents, you instructed Mr. Brooksbank to send those documents to an address in the Turks & Caicos Islands?" (Emphases added; see Fn. 8.)

Guido either fabricated this charge knowingly and with malicious intent, or we have an apparent case of gross incompetence. I'm now presuming the former, because when I first read Mr. Guido's obstruction claims against Franklin, out of professional courtesy I sent him an email noting this discrepancy. When I didn't hear back from him, I followed it up with a call. I was aware of his personal animosity towards Franklin,[9] but couldn't believe he would consider fabricating a charge as serious as this. I appreciate I can be very naïve at times, but I still was taken aback by Guido's abrupt response when I reached him. Let's just say he blew me off.

---

[9] During the July 28, 2003, deposition of Sam Wolanyk, another defendant in this case, Wolanyk reviewed a document and claimed that it had been falsified to appear as though he was the author, but he denied he was. Guido repeatedly asked him if he thought Franklin had falsified/created it. Wolanyk repeatedly said he doubted it.. At a subsequent break in the testimony, I asked Guido why he was suggesting Franklin had falsified the document. He replied loud and clear so that everyone in the room could hear: "That's what happens when you have a crook for a client, Mr. Meyers." He and I had subsequent conversations about that comment, which I told him I felt to be highly inappropriate for a Commission staff member to make. In our last conversation on this topic, he tried to convince me that the utterance was clearly meant as a joke. I can assure you that it was not received by anyone as such.

Stephen B. Cutler
Request to Investigate
March 11, 2004
Page 12 of 12

3.      **Request for Further Action.**

I find it difficult to contemplate that 4 out of the 4 attorneys involved with this Case
were either the instigators of, or were induced to become participants in, unethical and
perhaps criminal conduct. Given the unlikely odds of turning over 4 stones at random and
finding pestilence lurking underneath all, perhaps the problems are more systemic in nature.
Each of the actions complained of herein was done openly and notoriously, as each either left
a paper trail or was made in open court. The obvious conclusion is not only was there no
concern about being discovered, but no concern about adverse consequences from
supervisors. The belief by these attorneys that they can act with impunity is disturbing; that
they may be correct in their belief is frightening.

I am willing to suspend my judgment and give the Commission an opportunity to do
the right thing and investigate the matters raised in this letter. I believe Franklin to be
innocent of the charges raised against him in the Complaint. It is my hope that as the
Commission determines that our requests have merit, it may come to realize that the strident
settlement positions urged upon it by its trial attorneys are inappropriate and not justified by
the true facts.

Please contact me promptly with an indication of your intent in this matter. In the
mean time, I will be considering my alternatives, including determining whether, as an Officer
of the Court, I am required to disclose any of these matters to the appropriate legal body.

Very truly yours,

Stephan Jan Meyers

cc:    Darren Quinn, Esq.
       James E. Franklin
       Christopher Conte, Esq.



James E. Franklin, II   v.
Med-Search, Inc.

# EXHIBIT A

James E. Franklin, II
Vol. 2, June 16, 1998

[15] Q: This was to pay the rent on his apartment?

[16] A: I believe so.

[17] Q: And why was Jim Mahoney receiving money [18] from the corporation back in February?

[19] A: Jim Mahoney was consulting to the [20] corporation in February.

[21] Q: What was he doing?

[22] A: Corporate consulting.

[23] Q: With respect to which project?

[24] A: No specific project. It was basically [25] consulting. He's a professional MBA. He's got

**Page 131**

[1] experience.

[2] Q: Does he owe any money to the corporation?

[3] A: Does he owe any money to the corporation? [4] I don't know if he owes any money to the corporation.

[5] Q: Does the corporation owe any money to him?

[6] A: Not that I know.

[7] Q: Does the corporation owe any money to [8] Oliver Moench?

[9] A: It may owe money to Oliver Moench.

[10] Q: Does he owe the corporation any money?

[11] A: Not that I'm aware of. [12] Excuse me.

[13] (The witness left and then [14] returned to the room.)

[15] BY MR. JOHNSON:

[16] Q: Now, the Grand Havana stock, where are the [17] certificates?

[18] A: I'm sorry?

[19] Q: The Grand Havana stock, the restricted [20] stock, the 50,000 shares. Is that certificated or [21] uncertificated?

[22] A: I believe this is certificated, I [23] believe.

[24] Q: Where are the certificates?

[25] A: The certificates are I believe held in –

**Page 132**

[1] I think George Chachas has them. I may have the [2] certificates.

[3] Q: So you may have them or –

[4] A: I may have them or he may have them. I [5] don't recall. I'd have to go look.

[6] Q: And is it your testimony that that's your [7] personal property or that that's the corporation's [8] property?

[9] A: In this matter, I have to go back and [10] consult my legal counsel, because I don't know, you [11] know, in what capacity that I was acting. I'm trying to [12] think if we had any other activities with respect to the [13] company. So I'd

like to defer to counsel on that [14] particular issue.

[15] Q: Well, according to the 10-K, these were [16] issued to the corporation. Is that correct?

[17] A: Well, again, the corporation that it's [18] issued to is IPO Consultants, and the corporation is [19] Initial Public Offering Consultants; and because there-[20]'s dba of James E. Franklin, I think I have to have a [21] discussion with the attorney to determine ...

[22] Q: All right. So you don't know whether the [23] stock belongs to you personally or to the corporation?

[24] A: I don't know who the stock belongs to.

[25] Q: Are you familiar with the Red Hot Stock

**Page 133**

[1] Web site?

[2] A: I'm familiar with Red Hot Stock.

[3] Q: Okay. What is it?

[4] A: As best I can decipher, it's an advisor [5] service.

[6] Q: And who operates it?

[7] A: I don't know.

[8] Q: You don't know?

[9] A: Don't know.

[10] Q: Do you have any connection with that Web [11] site?

[12] A: No.

[13] Q: Do you know who does?

[14] A: No.

[15] Q: Do you have any explanation for why [16] several of the stocks that you've been involved in have [17] been profiled in that Web site?

[18] A: They like the stocks, they like the [19] companies.

[20] Q: And how do they find out about them?

[21] A: Research reports, publication.

[22] Q: Are research reports prepared by you?

[23] A: No.

[24] Q: Who prepares –

[25] A: You'll have to ask Red Hot Stocks.

**Page 134**

[1] Q: But you don't know who operates that Web [2] site; correct?

[3] A: I do not.

[4] Q: Have you ever paid any money to the [5] operators?

[6] A: No.

[7] Q: Do you know anyone who has?

[8] A: No.

[9] Q: Have you ever prepared any of the items [10] that get published in that

bulletin board on that Web [11] site?

[12] A: I haven't even looked at what they've [13] published on the bulletin board. And anything that was [14] prepared by IPO Consultants if used was our preparation, [15] not working with them.

[16] Q: Now, the $3,000 that was invested in [17] Curbstone came from the corporation's bank account; is [18] that true?

[19] A: That's correct.

[20] Q: And the same is true with the $2,500 that [21] was used to purchase stock in Capital Advisors; is that [22] also correct?

[23] A: Again, I think I already answered this [24] question. The corporation wrote a check. Whether it [25] was for expenses or purchases or how much, I don't have

**Page 135**

[1] a recollection.

[2] Q: Now, you're familiar with Moench [3] Communications; correct?

[4] A: I'm familiar with Moench Communications.

[5] Q: And that was formed in March of this year?

[6] A: If that's what the paperwork says, then I [7] would assume it was.

[8] Q: And that's an LLC; correct?

[9] A: I don't know. You want to show me [10] something that will –

[11] Q: Limited liability company?

[12] A: I believe they're a limited liability [13] company.

[14] Q: And Mr. Brooksbank is the agent in Nevada [15] for that company?

[16] A: I don't know. Does it say he is?

[17] Q: Do you know whether he is or not?

[18] A: I can't tell you, sitting here, if he is [19] or not.

[20] Q: And Sabina Soddemann, is she one of the [21] owners?

[22] A: I don't know.

[23] Q: How about Deneen Underwood; is she an [24] owner?

[25] A: I don't know.

**Page 138**

[1] Q: Deneen Underwood is someone that's been a [2] consultant working for your company; correct?

[3] A: Deneen's been a consultant.

[4] Q: And is she still a consultant for IPO?

[5] A: At times, from time to time.

[6] Q: She still works out of the Greenwich [7] Drive address?

[8] A: She does.

[9] Q: And Sabina Soddemann continues to provide [10] services to IPO as a consultant?



EXHIBIT A

SEP. 23 '99 (THU) 15:55

# EXHIBIT B

PAGE 35/46

Miller & Holguin
Attorneys at Law
1801 Century Park East
Seventh Floor
Los Angeles  California  90067
Telephone:  (310) 556-1990

| MATTER: Franklin Litigation | | | A/c 737/1 | Page 3 |
|---|---|---|---|---|
| DATE | ATTY | TEXT | HOURS | AMOUNT |
| 06/02/98 | DKP | Telephone conference with process server; Draft instruction letter to O.C. County Marshal re: writ of execution; Lexis searches re: Curbstone Acquisition. | 1.00 | 100.00 |
| 06/03/98 | KEJ | Telephone conferences re: investigation of enforcement issues; Telephone conference with P. Colton re: MJK. | 3.75 | 937.50 |
| 06/04/98 | DKP | | 0.50 | 50.00 |
| 06/04/98 | KEJ | REDACTED | 3.00 | 750.00 |
| 06/05/98 | KEJ | Draft letter to M. Tow. | 2.25 | 562.50 |
| | | REDACTED | | |
| 06/05/98 | DKP | Telephone conference with process server re: status. | 0.25 | 25.00 |
| 06/08/98 | KEJ | Draft notice of resumption of examination. | 0.50 | 125.00 |
| 06/09/98 | DKP | Preparation of new notice of levy in L.A. County; Draft instruction letter to process server re: same. | 0.75 | 75.00 |
| 06/09/98 | DAK | Telephone conference with O. Moench re: matter. | 0.25 | 75.00 |
| 06/09/98 | KEJ | Review chapter 13 petition; Correspondence with Franklin's counsel and P. Colton; | 2.50 | 625.00 |

35    EXHIBIT B

## EXHIBIT C

### Selective Pages from the Deposition of James Franklin
### Taken October 2, 2003, in the matter of
### SEC v. Cavanaugh.

Q. You know, given what you said, that you would
14  have to seek legal advice to counsel to determine
15  whether or not you're going to invoke your Fifth
16  Amendment right on matters concerning the SEC versus
17  Franklin case, you know, we can leave that -- for the
18  most part, we'll leave it alone and we'll have to
19  adjourn, and we may have to do this -- pick this up
20  again on that topic.
21    A.  Uh-huh.
22    Q.  But there are a few -- a couple questions I
23  want to ask.  And if you want to decline to answer until
24  you speak to counsel, we can cover them again at such
25  time.  But I want to just get a chance to ask you a
0153
 1  couple of questions.
 2        Previously, when we were talking about business
 3  dealings that you had with Mr. Brooksbank that were
 4  unrelated to Curbstone and to Capital, you said that
 5  there were a number of corporations in which
 6  Mr. Brooksbank helped set up for you.  And do you
 7  remember what the name of those corporations were?  Yes
 8  or no.  I'm not going to ask you -- well, that's a
 9  separate question of who they are.
10    A.  Yes.  Yes.
11    Q.  Were one of those corporations Net Income?
12  Again, I can -- I can wait until you tell me if you're
13  going to invoke the Fifth or not, or I'll let you
14  consult with your lawyer and we can adjourn this until a
15  later time.  But that's my question.  Did that include
16  Net Income?  Was that one of the companies that
17  Mr. Brooksbank set up for you?
18      MR. BROOKSBANK:  Objection.
19      THE WITNESS:  I -- I would have to consult my
20  outside counsel before I would answer that one, on his
21  advice.  I know he would instruct me to at least, you
22  know, seek his advice before I would answer that.
23  BY MR. LOWMAN:
24    Q.  Okay.  Now, in the -- now, isn't it true that
25  in connection with one of the corporations that
0154
 1  Mr. Brooksbank had set up for you, that the SEC had

EXHIBIT C                    Page 1 of 4

2    issued Mr. Brooksbank a subpoena for documents
3    concerning one or more of those corporations?
4        A.   I don't know.
5        Q.   Isn't it true that after Mr. Brooksbank
6    received that subpoena for those documents, you
7    instructed Mr. Brooksbank to send those documents to an
8    address in the Turks and Caicos Islands?
9        A.   On advice of counsel, I must consult before I
10   answer that question.
11       Q.   Are you aware that Mr. Brooksbank has testified
12   to those events?
13           MR. BROOKSBANK:  Objection.  That
14   mischaracterizes the testimony of myself.
15           THE WITNESS:  I'm not presently aware of these
16   facts.
17   BY MR. LOWMAN:
18       Q.   Did you know that Mr. Brooksbank gave both
19   investigatory deposition and deposition testimony with
20   regard to the events at issue in the SEC versus Franklin
21   case?
22       A.   I'm aware there's been some testimony.  I have
23   not reviewed that testimony specifically.  My lawyer
24   has.
25       Q.   Have you discussed with Mr. Brooksbank what the
0155
1    subject matter of his testimony to the SEC in the SEC
2    versus Franklin case was?
3        A.   No.
4        Q.   Now, after the SEC received and subpoenaed
5    Mr. Brooksbank for the documents relating to some
6    companies that you asked him to set up, did you ask
7    Mr. Brooksbank to assert the attorney-client privilege
8    to prevent the disclosure of those documents?
9            MR. BROOKSBANK:  Objection.
10           THE WITNESS:  Again, you know, if we're going
11   to get into these issues of the other case, I've got to,
12   you know, recess and get counsel before we --
13   BY MR. LOWMAN:
14       Q.   I understand that, and I'm just asking you the
15   question.  I had to find out what you're going to do.
16           Now, the SEC versus Franklin case, you had
17   mentioned earlier in your -- earlier in your testimony
18   that Mr. Chachas had worked with you on -- with a
19   company called Amalgamated; right?
20       A.   Yes.
21       Q.   And you had testified that Mr. Chachas had
22   worked with you with a company called Net USA; correct?

EXHIBIT C                    Page 2 of 4

23    A.  Yes.
24    Q.  And both of those companies are at issue in the
25  SEC versus Franklin case; correct?
0156
1      A.  They're both witnesses in the case.  Is there
2  anything at issue with those companies?  I don't think
3  so.
4      Q.  And in the SEC versus Franklin case, the SEC
5  has alleged that you violated the anti-fraud provisions
6  of the securities laws, as well as the anti-touting
7  provisions of the securities laws with respect to your
8  dealings in eleven different companies.  Isn't that
9  right?
10    A.  Well, I mean, their allegations are a matter of
11  public record.  It's on the Internet.  These are --
12  these are unfounded, unverified allegations.
13    Q.  Well, I'm asking you that's what the
14  allegations are; correct?
15    A.  The allegations speak for themselves.
16    Q.  Now, also in Exhibit 513, Mr. Einhorn enclosed
17  a copy of your bankruptcy filings that you submitted
18  around this time.  Did you, in fact, file for bankruptcy
19  in 1998?
20    A.  Yes.
21    Q.  And was the petition accepted and were your
22  debts discharged --
23    A.  No.
24    Q.  -- in bankruptcy?
25    A.  No.
0157
1      Q.  What -- what happened to that petition?
2      A.  We withdrew it.
3      Q.  Okay.  At which point in time in the process
4  did you withdraw it?
5      A.  I don't specifically recall.  I think it was
6  like within 60 days of the filing.
7      Q.  Had anyone from the trustee's office challenged
8  or brought to your attention deficiencies that were in
9  your pleading, in your filing?
10    A.  No.
11    Q.  Now, if we get into your filing in Schedule B,
12  personal property --
13    A.  Uh-huh.
14    Q.  -- and what I'm trying to figure out from
15  having looked at your bankruptcy filing is I didn't see
16  any reference to the shares of stock that you had owned
17  or had still owned at the time you made the filing.

EXHIBIT C            Page 3 of 4

18    A.   Uh-huh.
19    Q.   Do you know why they weren't -- there's no
20  reference to the Curbstone stocks in your bankruptcy
21  filing?
22    A.   I think we had determined that there was some
23  inaccuracies in the filing that we had to go back and
24  correct until we withdraw the filing to make those
25  corrections.
0158
1    Q.   Did you ever make those corrections?
2    A.   We -- we have, instead, opted to wait and
3  perhaps file a Chapter 7.
4    Q.   You understand that it's a crime to file an
5  incomplete or intentionally file a incomplete bankruptcy
6  petition, do you not?
7    A.   Well --
8       MR. BROOKSBANK:  Objection.
9       THE WITNESS:  No.
10       MR. LOWMAN:  Let's take a brief recess and
11  figure out -- I may be done, but I just want to check.

EXHIBIT C              Page 4 of 4



## ADDRESS CONTRACT

Corporate Service Center, Inc., a Nevada corporation
and
NET INCOME, a Corporation,
hereinafter referred to as *Client*, hereby agree to the following:

1.    Corporate Service Center, Inc., hereinafter referred to as Provider, will promptly handle, distribute and/or forward, hold, or remail all mail of Client as instructed by Client. Client hereby authorizes Provider to handle its mail as herein agreed.

2.    Mail received at 1475 Terminal Way, Suite E, addressed to NET INCOME will be forwarded to:

Street Address:    PO Box 107, Oceanic House, Duke Street

City:    Grand Turk        State:            ZIP:    Turks & Caicos Islands, BWI

Attention:    Paul Winder        Phone:    1-809-946-2828

3.    Special forwarding instructions: _____

4.    Client understands that all addressed mail must contain the exact Client name and the complete Reno address. Client must notify Provider in writing of any change of Client's forwarding address or contact phone number. In the event that the Client's forwarding address is inadequate or undeliverable, after reasonable attempts to notify Client, if no adequate forwarding address is obtained from Client, Provider will return mail to sender as undeliverable.

5.    Mail forwarding service will commence on Jan 28, 1997 and terminates on Jan 31, 1998.

6.    Client agrees to pay Provider the sum of $195.00. Client understands that this sum includes a non-refundable minimum deposit of $120.00, against which $3.00 plus postage will be charged for each packet of mail forwarded to Client by Provider. Client will be notified when the balance of this deposit reaches $20.00. All transactions are final.

7.    Client hereby expressly represents, warrants and vows to Provider that Client's use of Provider's services herein contracted by Client, will at all times be in compliance with all Nevada and Federal regulations, laws and statutes.

8.    Provider expressly reserves the right to move its physical office location at its discretion if so compelled by circumstances that, in the business judgement of Provider, warrant such a move. However, in such an event, Provider will continue to provide services herein agreed to Client, and Client agrees to pay any cost involved in moving that are specific to Client (e.g. printing costs, etc.).

9.    Client fully understands and acknowledges that Provider is not a legal or accounting firm and that Provider has not made any such representations or provided such advice to Client. All that Provider does is submitted and performed with the understanding that Provider is not engaged in performing legal, accounting or other such professional services. If legal advice or other expert assistance is required, the services of a professional person or firm should be sought.

10.    HOLD HARMLESS: Client shall indemnify and hold harmless Provider against and from any and all claims arising from Client's use of this agreement, from and against all costs, attorney's fees, expenses and liabilities incurred in or about any such claim or any action or proceeding brought thereon; and, in any case, from actions or proceedings brought against Provider by reason of any such claim.

11.    ENTIRE AGREEMENT: It is expressly understood that this agreement constitutes the entire agreement between the parties and that no statement, representation, promise or inducement made by any party hereto, its agents or employees, which is not expressly contained in this agreement, shall be binding or be of any force or effect.

12.    VENUE: This agreement shall be governed by the laws of the State of Nevada, and it is further covenanted and agreed between the parties that venue of any suit or controversy involving this agreement shall be exclusively within the State of Nevada.

Agreed to this   15   day of   July   of 19  97 , by NET INCOME, a Corporation.

BY: _____        TITLE:   Pres/sol

Agreed to this ___ day of _____ of 19 ___ by Corporate Service Center, Inc., a Nevada Corporation.

BY: _____        TITLE: _____



# EXHIBIT  G

June 29, 2007 follow-up letter from Meyers to SEC Commissioners

# STEPHAN JAN MEYERS, ESQ.

SUITE A-800
100 S. SUNRISE WAY
PALM SPRINGS, CALIFORNIA  92262

TELEPHONE: (858) 922-2006
FACSIMILE: (888) 501-3763
E-MAIL: STEVE@SMEYERS.COM

June 29, 2007

Commissioner Christopher Cox
Commissioner Kathleen L. Casey
Commissioner Paul S. Atkins
Commissioner Annette L. Nazareth
Commissioner Roel C. Campos
100 F Street NE
Washington, DC 20549

Re:    Complaint regarding activities of SEC Staff Attorneys
       Third Request for Investigation

To the Honorable Commissioners:

I am a former Enforcement Attorney with the Commission's San Francisco Branch Office.
On December 1, 2006, I sent each of you a letter detailing numerous instances of what I
believe to be improper, unethical, and/or illegal conduct engaged in by several SEC attorneys
in the course of a case in which I had been briefly involved.  The December letter was a
follow-up to a March 11, 2004, letter I had sent to Stephen Cutler, then the Director of the
Enforcement Division.   While I thought Mr. Cutler was blowing me off with the standard
"don't call us, we'll call you" letter he sent me, in fact his seemingly empty promise was
(unfortunately) fulfilled:  one of the staff attorneys whose actions were highlighted in my
March letter called the attorney who was then representing my former client, and threatened a
criminal prosecution against that client based upon the evidence I had submitted, and which
Cutler had obviously disclosed to him!

While the SEC attorney's position was obvious tortured and illogical, it certainly had the
desired chilling effect.  While initially I was shocked over the audacity of someone who knew
he could act with such reckless impunity (and an Enforcement Director who would condone
such behavior), that emotion has since changed to outrage.  The alleged perpetrators (save
Cutler) are still employed by your agency, and are still probably engaging in the same kind of
activities I carefully and fully documented.   Adding insult to injury, as I noted in my
December letter, I have been informed that no one at the Commission is charged with
overseeing the actions of the Commission's attorneys.  This takes "self regulation" to a new
low.

Commissioner Christopher Cox, et al.
June 29, 2007
Page 2 of 2

I have two very simple questions for all of you as Commissioners: WHAT are you going to do about the improprieties I documented, and WHEN? Will your staff attorneys be able to think of anything more original than threatening criminal prosecution of me? I read Mr. Cox's on-line biography, which claims, "During his tenure at the SEC, Chairman Cox has made vigorous enforcement of the securities laws the agency's top priority." If the way the Commission has handled the documented facts set forth in my March and December letters is any indication, God forbid how matters with a lower priority have been handled! Perhaps the only conclusion that can be drawn is that the distinction between "enforcing the securities laws" and "enforcing the laws applicable to those who enforce the securities laws" is too subtle to be grasped.

I believe that the evidence I previously submitted to the Commission speaks loudly and strongly, and stands on its own. Nevertheless, I remain willing to meet or speak with any SEC or DOJ personnel charged with investigating my allegations. I never received a response to my December letter. I expect one now, and not of the type sent in response to my March letter. As I previously noted, I used to be proud to say that I began my career as an Enforcement Attorney with the Commission. However, the way this matter has been ignored and/or improperly handled turns my stomach. I now believe that the taunts I received and dismissed over the last few years when I mentioned that I was a former SEC attorney – "Welcome back from The Dark Side!" – were in fact well founded.

Is there no one left at the SEC willing and able to restore my faith in its integrity?

Very truly yours

Stephan Jan Meyers

bcc: GZF

# EXHIBIT  H

April 28, 2004 "Un-Fairy Tale" investor letter by Meyers detailing misconduct

# STEPHAN JAN MEYERS, ESQ.

**Suite 131**
**204 NO. EL CAMINO REAL**
**ENCINITAS, CALIFORNIA 92024**

**CELL: (858) 922-2006**
**FACSIMILE: (760) 454-2336**
**EMAIL: Steve@smeyers.com**

April 28, 2004

To Potential Investors In Any
OGTF-Related Venture:

Re:                    **SEC v. Franklin, et al.:  An Un-Fairy Tale**

This is an extraordinary tale.  Not too long ago and certainly not too far away (late 1996 in the USA), there was a unique convergence of events that ultimately lead the Securities & Exchange Commission in January 2002 to file civil injunctive proceedings against Jim Franklin, his friend Sam Wolanyk, a business associate named Dieter Raabe, and various companies associated with those three men.  The convergence involved the simultaneous birth of the Internet, the largest economic rally in American history, and an SEC that was, in the words of one of its then Commissioners:  "under-funded, understaffed and, more importantly, misguided."[1]

The background to the SEC's case is quite fascinating.  Rather than telling you that the SEC's charges are baseless, and rather than claiming that their case was so shoddy that four of the SEC attorneys who were involved in the case appear to have felt it necessary to violated codes of conduct and/or statutes providing criminal remedies in order to keep their case alive, we will present our story and our documentation, and let you draw your own conclusions.  We are confident that full disclosure will expose the SEC for the shoddy, arrogant and extremely ruthless agency it has become.

This is said, sadly, by someone who started out his career as an Enforcement Attorney with the SEC thirty years ago, and who had been proud to list that accomplishment on his resume until seeing the full extent of the improper methods and unethical methods the SEC is currently willing to utilize to win a case.  When we investigated and filed cases 30 years ago, we followed the rules, recognizing that the means were as important as the ends.  Our integrity, and the integrity of the SEC, was more important than our won-lost "stats."  After reviewing the conduct in which we believe the SEC has engaged during this case, I'm ashamed of my association with the SEC.  It has morphed into an uncontrolled monster that appears to have lost the distinction between good and evil.  You are invited to make your own conclusion.

I will make only one suggestion to all of you who are reading this because you are considering investing in an OGTF-related project:  the SEC matter was "then"; this investment is "now."  They are separated not only by time and space, but by different business concepts.  And finally and most

---

[1]  See: "Corporate Scandal Dust Still Settling," quoting Commissioner Isaac C. Hunt, SEC Commissioner between 1996 and 2002.

Potential Investors with OGTF
April 28, 2004
<u>Page 2 of 14</u>

important, **Franklin is vigorously litigating his case against the SEC, and firmly believes he will prevail!**

        *          *          *          *          *

It's 1996; a time when this strange phenomenon dubbed the "Internet" was known to barely a few people. A year earlier, the only "web browser" was Mesilla[2], and MCI Mail and CompuServe were the email programs of choice and availability![3] Many incompetent bureaucrats and politicians feared the rise of the "Internet Democracy," an age when the public would suddenly become political activists due to their new ability to acquire information, register opinions, and thereby directly make public policy."

However, for two young San Diego men, Franklin and Wolanyk, it appeared to be a time of hope and promise. Franklin had been in the oil and gas business for years: his Godfather was president of an oil exploration company, and Franklin had spent summers with him since his youth. Franklin, then 34, had become a "Landsman"[4] when he was only 2X. Being instilled with the entrepreneurial spirit of his Godfather, Franklin spent most of his 20's and early 30's assisting emerging publicly-traded companies to survive in the rough and tumble world of the then-largely unregulated OTC and "Pink Sheet" markets to which recent amendments to the Securities Laws had relegated them.

Franklin's good friend Wolanyk was a few years younger than him, and while he mostly had pursued his primary avocation, surfing, he occasionally helped out Franklin around the office. As Franklin began do delve into computers, Wolanyk quickly self-educated himself about them, and became the office "guru." He even installed a large computer-based facsimile system[5] for Franklin, as Franklin wanted to use what we would now call a "fax blast" to contact as many brokerage firms as possible to interest them in selling or making a market in the stocks of those companies for which he was performing promotional tasks.

Wolanyk was a quick learner. He noticed that the best promotion a company could get was to get a write up in a national business magazine. He realized that the Internet could provide an equally effective vehicle, and developed a unique business model. He would establish his own newsletter, which would be distributed freely to those who either registered at his web site (called Red Hot Stocks.com) or responded to a banner ad he bought on another then-popular business site. Wolanyk was promising a free subscription to a soon-to-be-released investment newsletter to anyone who would click through and register his or her email address with him.

---

[2] See: "What was the first Web Browser"

[3] See: "Email History – How Email Was Invented"

[4] "**Landmen** are land management professionals who work in the petroleum and natural gas, mining, and mineral exploration and development industries. Their responsibilities usually include land acquisition, exploration and development, and specialized skills in negotiation, title procurement, and rights divestiture." (Summary of the Landmen Certificate, rev'd. March 19, 1999; American Association of Professional Landmen.)

[5] Wolanyk Deposition, p. 53.

Potential Investors with OGTF
April 28, 2004
Page 3 of 14

Soon, he had a database of thousands of names.  He planned to write up companies that had interesting stories to tell, highlighting factual information that was already of public record but which investors seemed to have missed.  He intended each profile to be accurate, and cleared nearly all of them with company personnel before publishing them.  His belief was that the new-found ability of smaller companies to receive the same kind of publicity via the Internet that previously had been reserved only for large public companies with huge advertising budgets, would produce the same results: increased awareness accompanied by increased stock prices.

Wolanyk's revenue model was not to charge the companies for this publicity; instead, he would give his subscribers advance notice of the companies to be profiled, and if and when their share price increased, they would be grateful to him.  Wolanyk himself would not buy any shares in the profiled companies, nor would he accept compensation from them.  Instead, he was confident that his grateful subscribers, who had profited handsomely from advanced notice of his newsletters, would gladly pay his nominal $30 per month proposed fee.  Based upon the number of free subscribers he had, if he could convert just one-third of his subscribers, he could make $1 Million per year.

This was an extraordinarily astute idea from a regulatory perspective too:  since he had neither received payment from the profiled companies or purchased stock himself and then sold it when it's price rose (referred to as a "pump and dump" scheme), he was not subject to strict disclosure requirements designed to thwart such schemes.  And as long as the profiles were truthful (he saw no need to exaggerate, for with the Internet, the medium was truly the message), he should have faced clear sailing.

All good stories have a plot twist.  Here, it was that Wolanyk became too successful!  The first company he decided to profile was Amalgamated Explorations (AXPL).  This was the company run by Franklin's Godfather, and a company with which Franklin had been working for years to promote.  At the time that Wolanyk chose AXPL, Franklin owned a substantial position in the company earned in return for his past efforts.  Wolanyk's testimony was unequivocal:  while he knew that Franklin owned some shares in AXPL, he chose AXPL on his own, not at Franklin's request or urging[6].  He had become interested in it just by hanging out with Franklin, and was impressed by its promise.  He interviewed AXPL's president (and Franklin's Godfather) for the profile, and was of the belief that everything in the piece was accurate, culled either from what the president told him, or from publicly available records about AXPL.  He showed the article to Franklin before it was released to his subscribers, but only to make certain that there were no inaccuracies in the piece.  He was aware that AXPL's technology was complicated, and he wanted to get it right.  Other than reviewing the article, Franklin had no connection with it.  Furthermore, none of Wolanyk's subscribers were known to Franklin—at that time, there were no programs that could merge two databases, and in any case, Franklin's program did not even have a line for recording email addresses, just facsimiles!  Indeed,

---

[6] Wolanyk Transcript, p. 46.

Potential Investors with OGTF
April 28, 2004
Page 4 of 14

Franklin was quite skeptical that these subscribers would at all be influenced by some email sent to them by someone they didn't even personally know.

Franklin was wrong. Very wrong: the newsletter was emailed out on Friday evening, January 17, 1997. It recommended a "strong buy" for AXPL. When the markets opened on January 20th, the stock rapidly shot up from around $6½ to hit a high of $27 before closing the day at $9. The trading volume increased from 9,800 shares on the 17th to 252,900 shares on January 20th. The increase was so dramatic that AXPL had to rush to put out releases that there had been no changes in the company's fundamentals, just the publicity from the newsletter. Franklin, who had received blocks of AXPL stock long before Wolanyk ever dreamed up this idea, and who had been working for AXPL for years without cash compensation, sold over half of his AXPL stock for $700,000, although since he was buying and selling throughout the day to attempt to modulate the price swings of this thinly-traded stock, his net for the day was reduced to $400,000.

With the success of this first foray, Wolanyk sought business advice from Franklin. He was becoming known, and was receiving calls at home from his subscribers because in order to register his web site, RedHotStocks.com, he had to list his phone number. Franklin advised him to set up a Nevada corporation to run RedHotStocks.com that would also set up and answer a phone line. Wolanyk said he knew nothing about corporations, and Franklin said he would help him by having his attorney set it up for Wolanyk. Franklin's California attorney advanced the $1614 necessary to do so to a Nevada attorney, who used a corporate headquarters-type company to set up Net Income, Inc., a Nevada corporation. The paperwork was funneled back through the California attorney who gave it to Franklin, who gave it to Wolanyk. Wolanyk reimbursed Franklin in cash for the advance.[7]

Thereafter, from approximately mid-January through mid-August 1997, Wolanyk wrote newsletters promoting approximately 13 additional companies. Nearly half were ones with which Franklin had been affiliated, but the majority were ones that Wolanyk developed on his own. Almost all companies that Wolanyk profiled experienced increases in their share price, often times lasting for 6 or more months. Franklin owned shares for over 6 months in only one additional company that Wolanyk profiled. When its share price rose, Franklin sold it at a profit.

Wolanyk was becoming somewhat of an Internet celebrity, Franklin was becoming popular with the companies that had been profiled, and the SEC was cranking up its investigative machinery. Clearly, something must be amiss here as small companies were able to raise money!

When the investigation began, Franklin, Wolanyk and Raabe were all represented by the same attorney, and as was the standard operating procedure of that attorney, they all asserted their 5th Amendment rights not to testify. Furthermore, given the simultaneous representation of all three parties

---

[7] Wolanyk Deposition, p. 60.

Potential Investors with OGTF
April 28, 2004
Page 5 of 14

by one attorney, there would have been conflicts of interest forcing dismissal of their attorney if any of
them chose to testify.

     Unfortunately, they were not advised of the detrimental ramifications from asserting their 5th
Amendment rights.  First, it really upsets the SEC staff:  the gauntlet has been thrown down, and now
they have to find something with which to charge the targets.  Why else would they assert their 5th
Amendment protections if they weren't guilty of something, is the usual thought.  Equally important,
since this was a civil case, Franklin and Wolanyk were not advised that if they continued to assert their
rights for much longer, they would be "precluded" from putting on any evidence at their trial to show
their innocence.[8]

     The SEC investigated this case fully during 1998 and early 1999 and then disappeared for three
years.  Franklin and Wolanyk thought the SEC had dropped the matter.  However, on January 12,
2002, just days prior to the running of the 5-year statue of limitations on the first AXPL newsletter, the
SEC filed a lengthy, blistering complaint against Franklin, Wolanyk and Raabe, as well as numerous of
their affiliated companies.  Even though it was poorly drafted, unverified, filled with rank speculation and
gross mischaracterizations, the SEC posted a copy of the Complaint prominently on its web site, and
appears to have meta-tagged it so that it will show up on any search dealing with "Internet fraud."

     Franklin has been vigorously defending himself for the past two years, and is confident that he
will prevail.  Indeed, he has some reasonable basis for that belief.  First, the SEC had been preparing a
massive Summary Judgment Motion against Franklin for months before the discovery cut off date.
However, the SEC's Motion was denied, which is a critical event in all litigated matters, but particularly
so when fighting the SEC.  Second, even though the SEC sought a preclusion Order against both
Franklin and Wolanyk (which would have ended the case right then), the Court did not allow it, and
instead both of them have been offering powerful and compelling testimony, totally consistent with each
other, that vividly demonstrates that neither Franklin nor Wolanyk engaged in the activities the SEC has
alleged.  Currently, and because of their recent testimony, a trial date has yet to be set.

     The charges against Franklin are very complex, and far beyond the scope of this document.  If
anyone desires to learn about them further, they should feel free to call the undersigned at the number
listed on the cover page.  However, the reasons why the charges are baseless are easy to explain, and
I'll briefly do so now.

---

[8] Because parties who assert their 5th Amendment rights will refuse to answer any questions during the entire
discover process, the Courts have established the concept of "preclusion" to prevent such parties from putting on
any evidence, including rebuttal evidence, as the other side will not have had an opportunity to take discovery of
them.  A simple translation:  preclusion equals a default.  The fact that they have asserted their 5th Amendment rights
not to incriminate themselves will allow the Court to draw inferences in this civil proceeding that they probably
committed the acts complained of.

Potential Investors with OGTF
April 28, 2004
Page 6 of 14

Because Franklin and Wolanyk had pled the 5th, there was no testimony to explain that Franklin set up the Nevada corporation, Net Income, for <u>Wolanyk</u>, <u>not for himself!</u> Both Wolanyk's testimony and Franklin's was powerful and unequivocal on that point: Franklin set up Net Income for Wolanyk, and thereafter had nothing to do with it. He as was paid back by Wolanyk in cash for setting it up, he had no shares of stock in it, was not an officer, director or employee, and never paid anything to Net Income/RedHotStocks, directly or indirectly, to write any of the profiles of the companies with which he was involved.

When the jury hears their testimony on this point, the SEC's case will fail: everything is linked to and depends upon the SEC establishing that Franklin controlled Net Income. Because he didn't, all of the charges against him fall:

A.      Franklin didn't violate the anti-fraud provisions of the 1933 Securities Act (§17(a)) or the 1934 Exchange Act (§10(b) and Rule 10b-5 promulgated thereunder, because <u>he</u> didn't send out the profiles, and thus did not engage in any so-called "pump and dump" scheme when he sold the shares that he had owned for 6 months at a profit immediately after the favorable report came out.

B.      Franklin therefore wasn't guilty of "touting" the stocks mentioned in the reports because he had nothing to do with their issuance or publication. Thus, he didn't violate §17(b) of the Securities Act. (And in any case, it does not appear that the reports constituted "touting," as the information they contained about a particular company was generally obtained directly from, and reviewed by, the companies themselves.

C.      Finally, there is a claim essentially unrelated to the RedHotStocks activity: that Franklin violated the registration provisions of Section 5 of the Securities Act in connection with one transaction in New York involving the parents of an investment banker friend (former) of his. The factual concept (that Franklin would somehow have been able to create and carry out a complex transaction under what was then Section M-11 of the New York Securities Laws involving the elderly parents (New York residents) of that New York investment banker who had published numerous articles about the availability of this obscure provision, is preposterous. Moreover, given the opportunity, Franklin believes he will be able to show that the SEC coerced materially incorrect testimony from the investment banker based upon improper threats made against him and his elderly parents.

So why should you believe us? Why should we have any credibility with you whatsoever? That's a good question, and I have good answers. We believe that we have collected competent and persuasive evidence that tends to show that the various SEC attorneys involved in this case committed violations of federal law and/or breaches of the Rules of Professional Conduct and/or the California Business and Professions Code in the conduct of their investigation of this case, and in its prosecution

Potential Investors with OGTF
April 28, 2004
Page 7 of 14

once filed.  We have submitted that information to the SEC to investigate further, and advise us whether our concerns are justified.  Since the evidence that we submitted to the SEC is all a matter of public record, we have given you the opportunity to draw your own conclusions.  Each of the events is referenced in attachments hereto.

In the mean time, please contact the undersigned with any questions or for further information.


Very truly yours,

*Stephan Jan Meyers*

Stephan Jan Meyers, Esq.
California State Bar No. 54104
Former Enforcement Attorney, United States
        Securities & Exchange Commission,
        San Francisco Branch Office (1974-77)

Potential Investors with OGTF
April 28, 2004
Page 8 of 14

## APPENDIX A

1.    **Potential Violation of 18 USC §1905 During the Investigation of this Case.**

During the formal investigation preceding the filing of this Case, the attorney in charge of the investigation appears to have divulged confidential information about Franklin to a friend of hers who, although formerly a Senior Counsel in the Division of Enforcement, was then in private practice and representing a party involved in litigation against Franklin. While the information was of course used by the law firm to try to intimidate Franklin and thereby gain an unfair advantage in that private civil matter, it appears that another purpose was to circumvent the Fifth Amendment rights Franklin had asserted in the SEC investigation by compelling him to answer those questions in the other matter.

This all began back in 1995, long before anything remotely related to the SEC case was even a figment of anyone's imagination. Franklin had filed a lawsuit in California state court against a company named Med-Search, Inc. He lost the case, and the Court awarded Med-Search substantial legal fees. On June 16, 1998, Med-Search took a judgment debtors examination of Franklin to locate assets upon which Med-Search could levy.

After 131 pages of routine questions based largely upon notations in ledgers and check registers, asking mostly "why was this person paid?" and "Do they owe any money to you" type questions, there was a startling and abrupt shift to questions concerning Red Hot Stocks, which was the name under which the SEC's formal investigation preceding the filing of this Case was conducted. These questions do not reference ledgers as their source, nor are any follow-up questions asked to locate assets upon which a levy and seizure could be made. Instead, Franklin is asked to answer the same key questions that Franklin was still taking the Fifth on in the ongoing supposedly "non-public" formal proceeding:[9] "Who operates Red Hot Stocks? ... Do you have any connection with that web site? ... Are research reports [concerning companies with which you are involved that Red Hot Stocks profiles on its web site] prepared by you?" (*See:* Exhibit A attached hereto for a true and correct copy of the relevant pages of the official transcript of the examination.)

Helaine Schwartz, the attorney who conducted the investigation in this Case, appears to be the person who leaked this information to the private attorneys expressly for the purpose of use against Franklin. Why do we suspect that? The Med-Search attorneys told Franklin so! On several occasions, Franklin was told of the relationship between one of the law firm's attorneys, Deborah A. Klar, and Ms. Schwartz. He was told that Klar was a former SEC attorney in Washington, and while so employed had become close friends with Schwartz. Indeed, Ms. Klar's on-line resume at her current firm states that she formerly was "Senior Counsel in the Division of Enforcement of the Securities & Exchange Commission, Washington, D.C." All of the communications about this special relationship with Ms. Schwartz were utilized for coercive purposes. For example, just before his debtor's exam, Franklin had made a settlement proposal to Klar's firm. At a break in the examination, which the record indicates Klar attended in the afternoon, Klar admitted her close association with

---

[9] 17 CFR 203.5

Potential Investors with OGTF
April 28, 2004
Page 9 of 14

Schwartz, and that she was the source of the questions. Furthermore, Klar specifically stated to
Franklin that through Schwartz she was familiar with the SEC's investigations of Franklin, and that he
was in "really deep shit." As a result of this knowledge, they were refusing to consider his settlement
offer.

Even without the admissions by both Klar and her law partner, a simple examination of the
questions asked of Franklin make the link to Schwartz obvious. Based upon the hundreds of questions
previously asked of Franklin during that examination, we would have expected the question of "Have
you ever paid any money to the operators [of the web site]?" to be followed by "Do they owe you any
money?" But it wasn't! Instead, Franklin is next asked: "Have you ever prepared any of the items that
get published … on that web site?" What could the answer to that question possibly have provided of
any benefit to the Med-Search attorneys? Absolutely nothing!

It should also be noted that the first question Franklin is asked about Red Hot stocks is not as
innocent as it first seems: it is worded in the precise language needed to establish a key liability element
under §17(b) of the Securities Act: that Franklin paid Wolanyk to publish the Company profiles on the
Red Hot Stocks web site.[10] But in a debtor's exam, the only relevant question is whether he was owed
money by Red Hot Stocks. This omission is indicative of the improper activity by Ms. Schwartz.

Section 1905 of Title 18 of the United States Codes criminalizes Schwartz' conduct. It
provides, in pertinent part, essentially as follows:

> Whoever, being an officer or employee of the United States or of any … agency thereof
> … divulges, discloses, or makes known in any manner not authorized by law any
> information coming to him in the course of … any examination or investigation made by
> … such agency or officer, which information concerns or relates to the operations, or to
> the identity, amount or source of any income, profits, losses, or expenditures of any
> person, shall be fined not more than $1,000, or imprisoned not more than one year, or
> both; and shall be removed from office or employment.

Finally, Exhibit B attached hereto provides further evidence confirming the admitted link to
Schwartz. It is one of the billing sheets that Klar's law firm filed in support of its motion for attorneys
fees. While this sheet, like many others, contains redactions that they refused to explain to Franklin,
they failed to redact the June 3rd entry by Kenneth E. Johnson, the partner in charge of this case and the
one conducting Franklin's examination. It states that some portion of his 3.75 hour entry was consumed
by a "telephone conference re: investigation of enforcement issues." Unlike every other entry on that
sheet, the identity of the party with whom he communicated is <u>not</u> revealed. While he might try to claim
that "enforcement issues" pertains to enforcement of a judgment (even after he tried to coerce a more
favorable settlement out of Franklin by acknowledging the connection with Klar), I'm positive it refers
to inquiries about SEC enforcement activities: one does not have a phone conference to "investigate"
how to enforce a judgment!

---

[10] One of the elements that must be established to establish liability under Section 17(b) is that the security was
promoted "for a consideration received or to be received, directly or indirectly, from an issuer, underwriter, or dealer,
without fully disclosing the receipt, whether past or prospective, of such consideration and the amount thereof."

Potential Investors with OGTF
April 28, 2004
Page 10 of 14

     And of course the negative impact it had on this Case is that it became a defining moment for Franklin whenever he considered waiving or not asserting his Fifth Amendment rights: knowing that the Government will use every opportunity to drag you down, it's better to keep silent than to give them any evidence that can be twisted against you. Where did Schwartz learn this behavior? Did she make it up on her own, or is it part of the new training modules that have been instituted at the SEC since I left?

        *        *        *        *        *        *        *

2.     **Potential Violation of 18 USC. §1001 at the Initial ENE Conference**

This Case was filed in January 2002. Franklin had a new trial attorney, and an opportunity to make new and different decisions about continuing to assert this 5th Amendment Rights. The time was the ENE status conference before the Magistrate held the following month, when the ground rules for conducting discovery during the case are established. It was there that Franklin first met Glenn Harris, the first SEC Trial Attorney assigned to this case. Harris made an indelible impression on Franklin: in response to a question from the Magistrate as to whether any parallel criminal proceedings were ongoing, Mr. Harris replied: "There are some law enforcement activities."

     Put yourself in the position of Franklin and/or his attorney. Franklin's course was sealed. There is only one response for Franklin's attorney that wouldn't result in a malpractice claim when a government attorney in a civil proceeding implies that there are parallel criminal proceedings against your client: have the client take the Fifth (which is what Franklin's attorney instructed him to do at deposition).

     Was what Harris said true? Were there actually then "law enforcement activities" pending? Certainly, Franklin was never aware of any law enforcement activities. He received no indications from friends or enemies that the FBI or any other investigators were making inquiries about him. No sense of being followed. No requests for information. Nothing. What if there really were no law enforcement activities? What if Harris just made it up? Could that possibly have happened?

     When I was first retained by Franklin to act as a placeholder until he could secure an experienced trial counsel, I ended up (through a strange but ultimately fruitful mix-up) speaking with an experienced attorney at the Federal Public Defender's Office in Los Angeles. As I tried to explain the situation, I was unable to recall the particular phrase that Harris had told the court. As I kept stumbling around, she asked me: "Was it 'law enforcement activities'?" I experienced a chill down my spine: could it possibly be that the SEC had a practice of making these kinds of false statements? She explained that she was familiar with that phrase being used by the government in similar situations, and her agency was also having problems as a result. She indicated that this would be difficult to prove, but if Franklin had not been made aware of any of the indicia that typically surround a criminal investigation, then it was more likely than not that none had occurred.

Potential Investors with OGTF
April 28, 2004
Page 11 of 14

Are SEC trial attorneys now being programmed to say this phrase?  It's a brilliant technique when the case is a dog and you need to rely on preclusion for a victory.  Brilliant technique, but fundamentally repulsive!

Except for 18 USC. §1001, which provides that "Whoever, in any matter within the jurisdiction of any department or agency of the United States knowingly and willfully … makes any false, fictitious or fraudulent statements or representations  …  shall be fined under this title or imprisoned not more than five years, or both."  Certainly if Harris knew the statement was false, it would violate §1001.  And even if the situation was only that he didn't know whether it was true and nevertheless uttered it as a true statement, he could be violating Rule 5-200 of the California Rules of Professional Conduct.  That Rule relates to trial proceedings, and provides that in presenting a matter to a tribunal, a member:

(A) Shall employ, for the purpose of maintaining the causes confided to the member such means only as are consistent with truth;

(B) Shall not seek to mislead the judge, judicial officer, or jury by an artifice or false statement of fact or law;

*           *           *           *           *           *

3.    **Possible Violations of the Rules of Professional Conduct, the California Business and Professions case, and a Court Ordered Discover Cut-Off Date.**

October 2, 2003, the SEC took Franklin's deposition in SEC v. Cavanaugh, 98 CIV. 1818 (DLC), a case pending in the Southern District of New York that had nothing to do with this Case. Franklin had been a relief defendant in that case, but when knowledge of this Case against Franklin became more widespread, his status was escalated in that case to that of a regular defendant.  By October 2, 2003, the discovery cut off date in SEC v. Franklin had long since passed, but that apparently was of no concern to Kenneth Guido, the SEC trial attorney who replaced Mr. Harris in the SEC v. Franklin case.  He appears to have induced or directed Michael K. Lowman, the SEC Staff attorney conducting the deposition in the *Cavanaugh* matter, to clear up a few loose ends that he hadn't yet been able to resolve in the *Franklin* case, even though the relevant Court-Ordered Discovery Cut-Off Date in *Franklin* had long since passed.

As noted in Exhibit C attached hereto, which consists of the relevant portions of the October 2 deposition, Mr. Lowman was an eager participant in bypassing the Court's discovery cut-off order, repeatedly posing questions to Franklin that had nothing to do with the *Cavanaugh* case.  He even admits he's going to turn over Franklin's testimony to his colleagues, a clear violation of the Court's

Potential Investors with OGTF
April 28, 2004
Page 12 of 14

discovery cut off date in the *Franklin* Case[11]. Indeed, his enthusiasm also appears to have blinded him to the requirements of Rule 2-100 of the California Rules of Professional Conduct, which prohibits contact with a represented party. Even though Lowman acknowledges that Franklin's attorney in the *Franklin* Case is not present, and that it would be more proper to wait until he was present, he just can't reign in his enthusiasm and states: "But I want to just get a chance to ask you a couple of questions." (p. 152, line 5 – p. 153, line 1.) And ask them he does!

Lowman claims they merely relate to the standards for imposing injunctive relief, but that is not true. Over Franklin's repeated objections and invocations of the Fifth Amendment, Lowman continues to hammer him with threatening questions such as:

> "Isn't it true that after Mr. Brooksbank received that subpoena for those documents, you instructed Mr. Brooksbank to send those documents to an address in the Turks and Caicos Islands?" (Transcript, p. 154, lines 5-8)

Of course, what Mr. Lowman actually appears to be doing was attempting to intimidate Franklin (outside of the presence of his trial counsel), as Guido was apparently already formulating a plan to use an ambiguity and/or clear mistake in Brooksbank's testimony to try to fabricate an obstruction of justice charge against Franklin, and Guido had clearly been rehearsing it with Lowman. (See: Subsection D, following.) Even Brooksbank, who was at the *Cavanaugh* deposition, was objecting to the mischaracterizations. And if that wasn't enough, Lowman pressed on with another series of questions to Franklin designed for further intimidation, incorrectly suggesting he had committed bankruptcy fraud.[12] The actions of both Guido and Lowman appear to be clear violations of the Court's Order establishing the discovery cut off date. Moreover, Lowman's actions in pressing forward with the deposition of a represented party when that party's attorney was not present appear to violate State Bar requirements. His communications are precisely the type for which the Rule was enacted: while proclaiming an innocent intent, he engaged in rank intimidation!

<div align="center">

*        *        *        *        *        *

</div>

**4.    Fabrication of an Obstruction of Justice Charge Against Franklin**

---

[11]    Cavanaugh Transcript, Page 151, lines 24-25: "granted what you tell me will go to my colleagues" on the Franklin Case.

[12] Lowman's assertion, clearly made to intimidate Franklin when his attorney was not present, is flat-out wrong. He challenged Franklin by essentially accusing him of Bankruptcy fraud by "intentionally fil[ing] an incomplete bankruptcy petition." Having practiced in the bankruptcy law field myself, I am familiar with the practices therein, and a significant portion of bankruptcy filings are intentionally filed as "incomplete," as they are filed on an emergency basis to stop a foreclosure and the like. There is even a standard term for these incomplete filings: "skeleton petitions."

Potential Investors with OGTF
April 28, 2004
<u>Page 13 of 14</u>

It appears the Mr. Guido is fabricating an obstruction of justice charge against Franklin. Guido has taken an obvious mistake in Brooksbank's deposition (the use to which even Brooksbank objected in *Cavanaugh*[13]) and twisted it beyond recognition. Even when his tactics are later discredited, he has nevertheless been able both to create an extremely bad impression of Franklin for the new judge that was just assigned to the Franklin Case, as well as create an opportunity to call in the FBI to investigate Franklin, which apparently has already occurred.

Here is how Guido did it. On June 30, 1998, Brooksbank was questioned about a 1-page memo dated July 15, 1997, that he received instructing him to send all of the Net Income files to the Turks and Caicos Islands. (A copy of that memo is attached hereto as Exhibit D.) Brooksbank states that Franklin called him "about a year ago, last summer" and told him to send the papers to those islands. When asked why, Brooksbank (erroneously) answers:

> [A] "I believe that was in response to a letter from the SEC from Rowley or an inquiry or something. He said I want you to send all the stuff over."
>
> [Q]: Because the SEC was investigating?
>
> [A]: I think so.
>
> [Q]: Did he say anything else about that?
>
> [A]: No."

Brooksbank was clearly in error, and if called as a witness will likely be correcting this testimony. Why was he wrong? Because "about a year ago, last summer" would be June 1997, and there was no SEC inquiry until early 1998, after the Formal Order was obtained in December 1997. Brooksbank had two contacts with Franklin that are at issue here. In July 1997 when Brooksbank received a copy of the memo from a third party instructing that the files be shipped out of the country, he called Franklin and asked what he should do. Brooksbank testified that he received this notice from his local contact, Rowley; there has never been a suggestion that it came to him from Franklin. Nevertheless, Brooksbank erroneously connects this with the time that Franklin called him about the notice he had received of the SEC inquiry, which was 7-8 months later, after the Formal Order was issued and long after Brooksbank testified he sent off the documents to the Turks & Caicos. It was only at that later time that Franklin "instructed" Brooksbank to do anything, and that was to assert the attorney-client privilege on Franklin's behalf in the SEC proceeding.

But besides this obvious discrepancy, Guido's fabrication lacks credibility. Brooksbank is an <u>attorney</u> licensed in Nevada, Montana and Wyoming, among other states. Franklin, on the other hand, is either Brooksbank's client, which Brooksbank tries to deny, or else he's just some "Joe" off the

---

[13] "MR. LOHMAN:  Isn't it true that after Mr. Brooksbank received that subpoena for those documents, you instructed Mr. Brooksbank to send those documents to an address in the Turks and Caicos Islands?
"MR. FRANKLIN:  On advice of counsel, I must consult before I answer that question.
"MR. LOHMAN:  Are you aware that Mr. Brooksbank has testified to those events?
"MR. BROOKSBANK:  Objection. That mischaracterizes the testimony of myself."
    Transcript, Exhibit C, p. 154, lines 5-14

Potential Investors with OGTF
April 28, 2004
<u>Page 14 of 14</u>

street. In either case, it strains credulity to have us believe that Brooksbank would meekly follow Franklin's "instructions" without exercising any professional judgment. Clearly, <u>if</u> it were true, as he mistakenly suggests, that he <u>was aware</u> of the SEC's investigation at the time he meekly accedes to Franklin's "instructions," I would conclude that it was Brooksbank, as the attorney who is supposed to know better, who is guilty of obstruction of justice! This would be even truer <u>if</u> Franklin were <u>not</u> his client, for then Franklin would not be in any position to "instruct" him to do anything!!

Guido's apparent fabrication cannot be viewed in isolation. Remember, he is the same person who apparently induced Lowman to assist him in violating the Court-ordered discovery cut off date. And there can be no doubt that Guido was feeding the questions to Lowman, as Lowman's question repeats the same error Guido was focusing on. Lowman asked Franklin: "Isn't it true that **after** Mr. Brooksbank received that **subpoena** for those documents, you instructed Mr. Brooksbank to send those documents to an address in the Turks & Caicos Islands?" (Emphases added; see Fn. 8.)

It would appear that Guido either fabricated this charge knowingly and with malicious intent, or we have an apparent case of gross incompetence. I'm now presuming the former, because when I first read Mr. Guido's obstruction claims against Franklin, out of professional courtesy I sent him an email noting this discrepancy. When I didn't hear back from him, I followed it up with a call. I was aware of his personal animosity towards Franklin,[14] but couldn't believe he would consider fabricating a charge as serious as this. I appreciate I can be very naïve at times, but I still was taken aback by Guido's abrupt response when I reached him. Let's just say he blew me off.

Guido's activities in both inducing Lowman to improperly interrogate Franklin and in fabricating this obstruction charge appear to be actionable under Rule 5-100(A) of the California Rules of Professional Conduct, among other provisions of law. That Rule prohibits anyone, including prosecutors, from using threats of criminal process to gain leverage in a civil proceeding. Guido is licensed in California, and his actions, if fully established, could subject him to disbarment.



---

[14] During the July 28, 2003, deposition of Sam Wolanyk, another defendant in this case, Wolanyk reviewed a document and claimed that it had been falsified to appear as though he was the author, but he denied he was. Guido repeatedly asked him if he thought Franklin had falsified/created it. Wolanyk repeatedly said he doubted it.. At a subsequent break in the testimony, I asked Guido why he was suggesting Franklin had falsified the document. He replied loud and clear so that everyone in the room could hear: "That's what happens when you have a crook for a client, Mr. Meyers." He and I had subsequent conversations about that comment, which I told him I felt to be highly inappropriate for a Commission staff member to make. In our last conversation on this topic, he tried to convince me that the utterance was clearly meant as a joke. I can assure you that it was not received by anyone as such.

# EXHIBIT I

Google search results & Declaration of Harm related to ongoing reputational damage

# Declaration of Harm and Request for De-Indexing

**Under California Consumer Privacy Act (CCPA) and Related Law**

**I, James E. Franklin, declare:**

1. I am a private U.S. citizen, currently residing in California, and I am submitting this declaration in support of my request to de-index outdated and reputationally damaging content from Google's search results.

2. The content at issue concerns a 2002–2005 civil enforcement action brought by the Securities and Exchange Commission (SEC). I was never criminally charged. The case is over 20 years old, and its lingering presence on Google has **prevented me from securing stable employment**, harmed my reputation, and caused significant ongoing emotional and financial distress.

3. The original case involved disputed legal findings and was based on incomplete and, in part, misleading evidence — issues I am actively addressing through formal legal proceedings under **Rule 60(b) of the Federal Rules of Civil Procedure** and a **petition to the United States Supreme Court**. I maintain that my conduct did not violate any securities laws and that I was denied a fair trial due to procedural irregularities and trial-by-surprise tactics.

4. The online material appearing in Google results is **no longer newsworthy**, has **no ongoing public interest**, and remains **disproportionately damaging** to my ability to rebuild my life. There is no public safety concern. I have engaged in **no similar conduct in the 20 years since**, and have continuously worked to reintegrate as a law-abiding citizen.

5. Under the **California Consumer Privacy Act (CCPA)**, I hereby request that Google de-index or de-prioritize these harmful search results, and exercise its discretion under **Google's own outdated content removal policy** to minimize the unjustified reputational harm caused by the continued visibility of these links.

6. I respectfully ask that this request be treated as a good-faith appeal for privacy, fairness, and dignity, supported by over two decades of clean personal and professional conduct, and by the legal avenues I am currently pursuing to challenge the basis of the original action.

I declare under penalty of perjury under the laws of the United States and the State of Florida that the foregoing is true and correct.

Executed on: 04/05/2025
Location: Sarasota, FL

Signature: _James Franklin_
Name: James E. Franklin



J. Franklin
1212 H. Street #125
Ramona CA 92065

JAMES FRANKLIN
1212 H ST
#125
Ramona CA 92065

SHIP US COURT HOUSE
TO: 333 W BROADWAY
STE 420
SAN DIEGO CA 92101-3806

USPS PRIORITY MAIL ®

USPS TRACKING #

9405 5118 9956 0165 6032 76

US Court House
333 W. Broadway
Suite 420
San Diego, CA
92101

RECEIVED
APR 1 4 2025
CLERK, U.S. DISTRICT COURT
SOUTHERN DISTRICT OF CALIFORNIA
BY                    DEPUTY

